532 A.2d 325

**David M. BARASCH, Consumer Advocate,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION.**

**Appeal of EQUITABLE LIFE ASSURANCE SOCIETY, Joseph Horne Company, Kaufmann's and Gimbels.**

**David M. BARASCH, Consumer Advocate, Appellant,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION.**

Supreme Court of Pennsylvania.

Argued March 11, 1987.

Decided Oct. 15, 1987.

146

Dennis S. Shilobad, E.J. Strassburger, Strassburger & McKenna, Pittsburgh, for Equitable Life Assur. Soc., Joseph Horne Co., Kaufman's and Gimbel's.

Daniel Clearfield, Asst. Consumer Advocate, Harrisburg, for David M. Barasch.

Charles E. Thomas, Thomas & Thomas, Harrisburg, for Duquesne Light Co.

Alan L. Reed, Thomas P. Gadsden, Morgan, Lewis & Bockius, Philadelphia, for Pa. Power Co.

John A. Levin, Bohdan R. Pankiw, Billie Ramsey, Daniel P. Delaney, Harrisburg, for Pa.P.U.C.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

### OPINION

NIX, Chief Justice.

Before us are two consolidated appeals questioning the right of a public utility to recover certain costs from its ratepayers. We are called upon to decide whether section 1315 of the Public Utility Code ("Code"), 66 Pa.C.S. § 1315, bars an electric utility from amortizing costs incurred in connection with plant-construction projects which were cancelled prior to completion, and whether, if the statute must be so read, it violates constitutional safeguards. We must also determine whether vacant land, purportedly held by a utility company "for future use," is properly includible in its rate base.

In 1973 the Central Area Power Coordinating Group ("CAPCO"), a group of various electric utility companies,[1] formulated a plan to construct seven nuclear electric plants. By 1977, despite considerable public opposition, CAPCO had forged ahead with the construction projects. In 1979 the Pennsylvania Public Utility Commission ("Commission"), on its own motion, began an investigation of the CAPCO program because of delays and other construction problems that were afflicting the projects. In January of 1980, about six months after the Commission had begun its investigation, CAPCO announced that construction would be cancelled on four of the seven nuclear plants.[2] The reasons assigned for that decision included: growing political and regulatory uncertainties arising from the nuclear accident at Three Mile Island, serious financial constraints of various CAPCO members, and a reduced need for additional future generating capacity.

The Duquesne Light Company ("Duquesne") had joined CAPCO in 1967, and was a substantial participant in the group's plant construction venture. Duquesne's share of the construction costs of the four cancelled plants was $34,697,389. In 1980, after the cancellation, Duquesne instituted rate proceedings before the Commission; and thereby sought the right to amortize, over a ten-year period, the construction costs it had borne with respect to the four plants. The same request was made in 1981. However, in each of those rate proceedings the Commission deferred ruling on the request until it received a report relative to its ordered investigation of CAPCO's construction problems.

In April 1982 Duquesne again came before the Commission. This time the company filed a tariff which proposed a change in its rates to increase its annual electric revenues by more than $165,000,000. In conjunction, the utility once more sought to amortize its expenditures on the cancelled plant projects. Several parties appeared in opposition to

1. The members of CAPCO were: Duquesne Light Company, Pennsylvania Power Company, Cleveland Electric Illuminating Company, Ohio Edison and Toledo Edison.

2. The four cancelled projects were: Davis-Besse Units 2 and 3; and Erie Units 1 and 2.

Duquesne's request, including the Office of the Consumer Advocate and several commercial complainants.[3] On October 15, 1982, during the pendency of the proceedings last mentioned, an Administrative Law Judge ("ALJ"), Joseph P. Matuschak, filed with the Commission the awaited investigation report.

The ALJ's "Report of Investigation" set forth his findings and recommendations concerning the CAPCO projects and Duquesne's participation therein. Among his determinations were the following: (1) that Duquesne acted prudently in joining in the ownership of the nuclear plants; (2) that the decision to delay until 1980 the cancellation of the four plants in question was prudent; and (3) that the interim decisions regarding the cancelled plants were prudent. In light of these findings or conclusions, ALJ Matuschak recommended that the Commission allow Duquesne to amortize, in rate proceedings over a period of ten years, its share of the construction costs of the four cancelled units. That recommendation, if accepted, would permit Duquesne to include in its reported operating expenses an additional $3,469,739 for each of the ten years of amortization.

On December 30, 1982, while the Duquesne rate case was still before the Commission, Act No. 335, P.L. 1473, was enacted into law. That statute amended the Public Utility Code by adding thereto section 1315. In parts here pertinent, the text of Act No. 335 is as follows:

## AN ACT

Amending Title 66 (Public Utilities) of the Pennsylvania Consolidated Statutes, providing *a limitation on the consideration of certain costs in the rate base* for electric public utilities.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

3. Equitable Life Assurance Society, Joseph Horne Company, Kaufmann's, and Gimbels.

Section 1. Title 66, act of November 25, 1970 (P.L. 707, No. 230), known as the Pennsylvania Consolidated Statutes, is amended by adding a section to read:

§ 1315. Limitation on consideration of certain costs for electric utilities.

Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or improve safety at existing facilities or as may be required to convert facilities to the utilization of coal, *the cost of construction or expansion of a facility* undertaken by a public utility producing, generating transmitting, distributing or furnishing electricity *shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public.* Except as stated in this section, no electric utility property shall be deemed used and useful *until it is presently providing actual utility service to the customers.*

Section 2. This act shall be applicable to *all proceedings pending before the Public Utility Commission and the courts at this time.* Nothing contained in this act shall be construed to modify or change existing law with regard to rate making treatment of investment in facilities of fixed utilities other than electric utilities.

Section 3. *This act shall take effect immediately.* APPROVED—The 30th day of December, A.D. 1982. (Emphasis added.)

On January 28, 1983, almost one full month after the enactment and effective date of the above statute, the Commission entered an order which accepted the recommendation of the ALJ concerning the ten-year amortization of Duquesne's portion of the construction costs of the four cancelled electric plants. The Commission's order thus meant that in the rate proceeding then before it, and for nine additional years, Duquesne could include in its reported operating expenses a one-tenth amortization charge of

$3,469,739. The Commission's order also granted Duquesne leave to increase its electric operating revenues by approximately $105,850,000.

In response to the Commission's order of January 28, 1983, the OCA petitioned for reconsideration and modification, asserting that the order violated the newly-enacted section 1315 of the Code. The Commission granted reconsideration, but proceeded to affirm its order after concluding that section 1315 did not prohibit its treatment of the costs in question. In the Commission's view, the statute was not intended to prevent "the recovery of prudent investment in a plant which is prematurely retired or one which is cancelled by reason of a change in economic circumstances." According to the Commission, section 1315 of the Code only barred adding the costs of incomplete construction to an electric utility's *rate base*, and did not disallow passing those costs on to ratepayers through *amortization.* Regarding the express dictate in section 1315 that such costs "shall not be made part of the rate base *nor otherwise included in the rates charged*" (emphasis added), the Commission opined that the foregoing statutory language was intended solely to prevent the regulatory agency from giving a utility dual benefits of the costs, *i.e.*, including the costs in the rate base *and* in some other rate making process. The Commission further concluded that the proscription in section 1315 was but a mirror of the agency's historic regulatory approach to the costs of construction work in progress.

On May 18, 1983, in response to the Commission's denial of the request for modification, the OCA petitioned the Commonwealth Court to review the Duquesne rate order. A petition for review was also filed, jointly, by the several commercial complainants. The sole issue raised in both appeals was the validity of the Commission's decision to allow Duquesne to recover, in its rates, its share of the costs of the cancelled plants.

In July of 1983 another CAPCO member, Pennsylvania Power Company ("Penn Power"), filed a tariff proposing to

raise its annual electric revenues by $19,980,000. In connection with that request Penn Power sought to amortize over a span of ten years the sum of $9,569,665, which represented its share of the costs of the four terminated construction projects. As a further matter, Penn Power sought to add $824,074 to its rate base because of certain investments denominated "land held for future use." This latter item referred to interests in unimproved land held by the utility purportedly for future use as the sites electric substations and transmission wires. According to the utility's projections, the land would be devoted to such uses within the next ten years. Another request made by Penn Power was that it be allowed to normalize the income-tax consequences of a change in depreciation methodology. Each of the foregoing requests was opposed by the OCA.

By an order dated April 11, 1984, the Commission granted Penn Power a rate increase of $15,364,000. Relying on its decision in the Duquesne rate case, the regulatory agency accorded Penn Power the same ten-year amortization right.[4] As for the land investments, the utility was permitted to include their cost in its rate base. To justify that part of its decision, the Commission pointed to what was described as its traditional policy of allowing such investments to be included in a utility's rate base if the property is held pursuant to a definite plan for its use within a "reasonable time." The agency determined that the land interests in question, though conceivably to remain unused for up to ten years, met that requirement. In this regard, the Commission observed that "historically" land or facilities held by a utility for future use in the public service have been a subject "separate and distinct from that of construction work in progress." In the agency's perception, the legislature did not intend to abrogate that policy in enacting section 1315 of the Code. Penn Power also prevailed on its tax normalization claim.

4. Penn Power received the same favorable treatment in the ALJ's investigation report that Duquesne had been given.

The Commission's order in favor of Penn Power caused the OCA to file another petition for review with the Commonwealth Court. As in the Duquesne case the challenge was made that the order of the regulatory agency, in its treatment of certain costs incurred by the utility, violated section 1315 of the Code. The OCA also sought reversal of the ruling on the tax normalization issue.

For purposes of argument and disposition the Commonwealth Court consolidated the appeals in the Duquesne and Penn Power cases. Then, by a four to three decision, that court held that the Commission had correctly construed section 1315. *Cohen v. Pennsylvania Public Utility Commission,* 90 Pa.Cmwlth. 98, 494 A.2d 58 (1985). Opining that section 1315 is ambiguous, the Commonwealth Court majority looked first to the title of Act No. 335 as a construction aid. The title declares that the Act provides "a *limitation* on the consideration of certain costs in the *rate base* for electric public utilities." (Emphasis added.) Of the preceding quoted phrase, the court said that it relates exclusively to the rate base "and not a legislative intent to exclude the costs of cancelled facilities from the revenue or expense factors of ratemaking." *Id.* at 105, 494 A.2d at 61.

The Commonwealth Court thus concluded that the legislature intended the prohibition in section 1315 to apply *only* to rate base considerations, and not at all to expense allowances. As further support of that conclusion the majority opinion cited other, pre-existent provisions of the Code, namely sections 1307 and 1310, 66 Pa.C.S. §§ 1307, 1310. Those two sections, according to the court's reading of their significance to ratemaking, evince a long-standing legislative intention to restrict only the elements of a utility's rate base, not the items that can be allowed as operating expenses. As for the part of section 1315 upon which the OCA relied, *i.e.,* the disjunctive phrase *"nor otherwise included in the rates charged,"* the Commonwealth Court agreed with the Commission's view that the phrase was meant only to prevent a utility from gaining dual benefits from the challenged costs.

Having equipped itself with the reasoning described above, the Commonwealth Court affirmed the Commission's orders allowing Duquesne and Penn Power to amortize their respective shares of the costs of the cancelled nuclear plants. The court also affirmed the agency's decision to allow Penn Power to include in its rate base the cost of its investments in the unimproved land, concluding that the property was "used and useful" in the public service. However, the court reversed the Commission as to its grant of Penn Power's tax normalization request.[5]

The OCA petitioned this Court for an allowance of appeal. Another such petition was filed by the commercial complainants who had joined as parties-appellant before the Commonwealth Court. We granted both petitions, in light of the public significance of the issues presented and implicated. After permitting Duquesne and Penn Power to intervene as appellees, we consolidated the cases for argument and decision.

Urging us to reverse the Commonwealth Court's decision relating to the cancelled plant costs and the land investments, the appellants repeat their arguments based on section 1315 of the Code. The Commission, unsurprisingly asserting that the court below correctly decided both questions, re-expounds the reasoning the agency pursued in making its final adjudications. Giving its reasoning a somewhat different emphasis, the Commission here argues that section 1315 was intended to prevent a utility from *earning a rate of return on such costs*, but not to disallow their *recovery* if the expenditures were prudently made. Contending that its reasoning reflects the legislative intent underlying section 1315, the agency directs our attention to section 520 of the Code, 66 Pa.C.S. § 520, a provision which became effective on October 10, 1985, almost three years after the enactment of section 1315. Section 520(c) provides as follows:

5. There was no cross-appeal taken from this part of the court's decision.

(c) Regulatory treatment of *costs.*—Notwithstanding any other provisions of this title, *for a generating unit canceled after the effective date of this section,* either voluntarily or by commission order, *an electric utility may be permitted to recover a return of, but not a return on, prudently incurred costs on any partially completed facility when cancellation is found by the commission to be in the public interest.* The burden of proof to show that any costs claimed were prudently incurred shall be on the public utility.

(Emphasis added.) 66 Pa.C.S. § 520(c).

In the Commission's view, the 1985 provision for the recovery of cancelled plant costs indicates that the legislature had the same intent when it enacted section 1315 in December of 1982. The Commission further maintains that, with respect to the cancelled plant costs of Duquesne and Penn Power, its decision to permit recovery through amortization was a discharge of its duty to balance the interests of consumers and utility investors when determining what are "just and reasonable" rates.

The two intervenors, Duquesne and Penn Power, add arguments of a different dimension. The utilities argue that section 1315, if given the construction propounded by the appellants, would violate both the federal and state constitutions. They assert that if not allowed to recover from ratepayers prudently incurred costs of cancelled plant projects, such a ban will amount to a confiscation or "taking" of their property without just compensation. The intervenors also contend that, since section 1315 of the Code applies only to electric utilities, it violates the equal protection clause of the United States Constitution, and the prohibition against special legislation set forth in Article III, Section 32 of the Pennsylvania Constitution. The utilities advance two other constitutional arguments: that section 1315 denies them due process of law because the legislature made it retroactive; and that Act No. 335, which added section 1315 to the Code, violates the state constitution because the title of the Act does not suggest that the

legislation emcompasses anything other than rate base considerations.[6]

## Statutory Interpretation

We will consider first the competing assertions concerning the proper interpretation of section 1315. As previously noted, the OCA and the other appellants rely on the section's express statement that construction costs "shall not be made part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public." To the appellants the crucial element in that proscription, relative to the instant case, is the phrase *"nor otherwise included in the rates charged."* Because of that phrase, the appellants maintain that section 1315 is a clear statement of a legislative intent to bar electric utilities from recovering the costs of cancelled plants through rates charged to consumers. The Commission asserts that section 1315 suffers from an ambiguity: perceived by the agency as arising from the title of Act No. 335, which describes the legislation as "providing a limitation on the consideration of certain costs in the rate base of public utilities." To the Commission, it is significant that the preceding language mentions only *"the rate base,"* and does not include the more encompassing phrase *"nor otherwise included in the rates charged."* With that perception of an ambiguity the Commission argues that section 1315 requires interpretation; and further argues, along lines we have already mentioned, that the legislature's actual intent is reflected by the more limited terms of the title of Act No. 335.

It is well settled that the object of all interpretation and construction of statutes is to ascertain and effectuate the

6. By "title" the intervenors refer to the first five quoted lines of Act No. 335 following the words "An Act." Although the Commission calls that group of words a "preamble," we consider "title" to be the more accurate designation and will refer to it as such. *See generally* Sutherland, *Statutory Construction,* §§ 20:03, 20:10, and 22:08 (4th ed. 1985) (difference between preamble and title).

intention of the legislature as expressed by the words employed. 1 Pa.C.S. § 1921(a); *Commonwealth v. Fisher*, 485 Pa. 8, 400 A.2d 1284 (1979); *Pennsylvania Human Relations Commission v. Alto-Reste Park Cemetery Ass'n.*, 453 Pa. 124, 306 A.2d 881 (1973); *Clearview Bowling Center, Inc. v. Hanover Borough*, 430 Pa. 579, 244 A.2d 20 (1968).

It is fundamental that in ascertaining the legislature's intent, the plain words of its laws may not be ignored. *Stegmaier Estate*, 424 Pa. 4, 225 A.2d 566 (1967). A court may not alter, under the guise of interpretation, the express language and intent of the legislature. *Commonwealth v. Pope*, 455 Pa. 384, 317 A.2d 887 (1974); *see Zimmerman v. O'Bannon*, 497 Pa. 551, 442 A.2d 674 (1982). Thus, where the words of a statute are clear and free from ambiguity, a court may go no further to determine the legislative intent. *Kritz Estate*, 387 Pa. 223, 127 A.2d 720 (1956); *Rich v. Meadville Park Theatre Corp.*, 360 Pa. 338, 62 A.2d 1 (1948); *Commonwealth ex rel. Smith v. Clark*, 331 Pa. 405, 200 A. 41 (1938); *see* 1 Pa.C.S. § 1921(b), (c). It is only when the words of the statute are not explicit that the intention of the legislature may be ascertained by considering other means of statutory interpretation or construction. *Davis v. Sulcowe*, 416 Pa. 138, 205 A.2d 89 (1964); *Commonwealth v. Chester County Light and Power Co.*, 339 Pa. 97, 14 A.2d 314 (1940).

Language is "ambiguous" when it conveys two or more reasonable meanings; or when it is otherwise vague, uncertain or indefinite. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY. Of the two statutory phrases respectively championed by the opposing parties, as expressing the legislative intent underlying section 1315, neither of those two word-sets is of itself facially ambiguous. On its face, there is nothing vague or uncertain about the language of the title. The phrase "limitation on the consideration of certain costs in the rate base" clearly describes a specific subject of concern: the impact of certain costs on an electric utility's *rate base*. If this phrase is

read as the controlling expression of legislative intent, it could only mean that the legislature's sole purpose in enacting section 1315 was to exclude the costs of uncompleted construction projects from the utility's rate base. It would then follow that the statute itself was not intended to bar a utility from charging those costs to ratepayers as operating expenses. On the other hand, there is nothing facially vague, uncertain or indefinite about the substantive proscription in section 1315 itself. That proscription clearly conveys but one meaning: that the costs of uncompleted projects shall not only be excluded from the rate base, but shall not, in any way whatsoever, be included in the rates charged.

■ Thus, the interpretational problem that confronts us here is one arising from an inconsistency of legislative articulation in the same enactment. To solve that problem we need look no further than the rule of statutory interpretation set forth in section 1934 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1934. This rule mandates that: "[e]xcept as provided in section 1933 of this title (relating to particular controls general), *whenever, in the same statute, several clauses are irreconcilable, the clause last in order of date or position shall prevail.*" (Emphasis added.) Since, in our view, the disjunctive proscription in section 1315 is of itself unambiguous, and since it is positioned after the title of the statute by which it was enacted, the terms of that proscription must prevail over the language of the title as being the expression of legislative intention. Moreover, it is an established principle of our jurisprudence that, where the enacting clause of a statute is clear and unambiguous, the title will not be permitted to contradict it. *Commonwealth v. Magwood,* 503 Pa. 169, 469 A.2d 115 (1983); *American Surety Company's Case,* 319 Pa. 549, 181 A. 364 (1935); *Commonwealth ex rel. The Alliance Petroleum and Coal Co. v. Slifer,* 53 Pa. 71 (1866). The same is true with respect to preambles. *American Surety Company's Case.* Although titles and preambles are accepted aids in resolving ambiguity in an enacting clause,

they may not be used to create ambiguity where none exists in the clause.

We therefore hold that section 1315 of the Code must be read as prohibiting an electric utility from recovering the costs of cancelled plants from ratepayers, either by making such costs part of its rate base or by converting them into operating expenses through amortization. For us to reach any other conclusion, we would have to treat as surplusage that part of section 1315's proscription which says: "... *nor otherwise included in the rates charged by the electric utility.*" It is well settled that the legislature cannot be deemed to intend that its language be superfluous and without import. *E.g., Colodonato v. Consolidated Rail Corp.,* 504 Pa. 80, 470 A.2d 475 (1983); *Consumers Education and Protective Ass'n. v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977); *Daly v. Hemphill,* 411 Pa. 263, 191 A.2d 835 (1963); *Commonwealth v. Mack Bros. Motor Car Co.,* 359 Pa. 636, 59 A.2d 923 (1948).

The appellate courts of several other jurisdictions have interpreted their state law as preventing an electric utility from treating as "operating expenses," and thus recovering from ratepayers, the costs of cancelled nuclear projects. One such case is *Office of Consumers' Counsel v. Public Utilities Commission of Ohio,* 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), *appeal dismissed sub nom. Cleveland Electric Illuminating Co. v. Office of Consumers' Counsel,* 455 U.S. 914, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982). In that case, the state regulatory body granted an electric utility a rate increase of approximately $70,000,000, and, in conjunction, allowed the utility to amortize over a ten-year period its $56,000,000 investment in four cancelled nuclear power plants. The Supreme Court of Ohio reversed the agency's order as to the amortization, holding that to allow the utility to amortize its investment in the terminated projects, and thus permit its recovery from ratepayers as operating expenses, violated state law. The court concluded that under Ohio's rate statute a utility's recoverable costs were limited to those which are ordinary and recur-

rent in the rendition of service to the public, and that the sunk costs of uncompleted capital projects did not come within that category. In the words of the opinion supporting the court's decision, "what the company sought and what the Commission granted was the amortization *as service-related costs* of an investment that never provided any service whatsoever to the utility's customers." 67 Ohio St.2d at 164, 423 N.E.2d at 827 (emphasis added). The opinion further stated that, in the absence of explicit statutory authorization, the regulatory agency could not benefit a utility's investors by guaranteeing the full return of lost capital at the expense of the ratepayers. *Id.* at 167, 423 N.E.2d at 829. It is worth noting that the utility in the foregoing case, Cleveland Electric Illuminating Company, was a member of CAPCO, and that the four cancelled projects there in issue are the same ones which are involved in the appeals now before us.

The Supreme Court of Wyoming, in *Pacific Power & Light Co. v. Public Service Commission of Wyoming*, 677 P.2d 799 (Wyo.1984), rejected an electric utility's attempt to compel its customers to bear the cost, through rates, of its expenditures and obligations in connection with cancelled nuclear power construction projects. The electric company, while recognizing that the terminated projects did not constitute "used and useful" property within the meaning of Wyoming's utility statute, nevertheless asserted that the implicated costs were includible in its rate base as prudently incurred operating expenses. The Supreme Court of Wyoming rejected that argument for several reasons, not the least of which was its conclusion that such capital costs did not qualify as "operating expenses," prudent or otherwise. A comparable result was reached by the Court of Appeals of Indiana in the case of *Citizens Action Coalition v. Northern Indiana Public Service Co.*, 472 N.E.2d 938 (Ind.Ct.App.1984). That court expressly embraced the decisions in *Office of Consumers' Counsel, supra,* and *Pacific Power & Light Co., supra,* as being consonant with Indiana law.

Also deserving of mention is the 1984 decision of the Supreme Court of New Hampshire in *Appeal of Public Service Co. of New Hampshire,* 125 N.H. 46, 480 A.2d 20 (1984). That case, too, involved an attempt by an electric utility to recover from its ratepayers the cost of its financial participation in a subsequently aborted project to build a nuclear generating plant. The utility had become part owner of the project in 1972; and, by 1981, when the project was cancelled, the company's investment in the uncompleted construction was nearly $16,000,000. The New Hampshire court held that, by force of a statute enacted in 1979, such costs could neither be included in the utility's rate base nor amortized as an operating expense. The statutory provision relied on by the court stated that: "At no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed." RSA 378: 30-a (Supp.1981). The same statute continued with the following mandate:

All costs of construction work in progress, including, but not limited to, any costs associated with constructing, owning, maintaining or financing construction work in progress, shall not be included in a utility's rate base *nor be allowed as an expense for rate making purposes* until, *and not before,* said construction project is *actually providing service to consumers.* (Emphasis added.)

In our view, the substantive terms of the New Hampshire statute bear a striking resemblance to section 1315 of our Public Utility Code.[7]

The Commission's reference to section 520(c) of the Code is unavailing. It is true that, as a result of the enactment of section 520, electric utilities are *now* permitted to recover cancelled plant costs under certain circumstances and condi-

7. Other appellate courts have held that an electric utility does have the right to amortize the costs of cancelled nuclear projects. *E.g., Attorney General v. Department of Public Utilities,* 390 Mass. 208, 455 N.E.2d 414 (1983); *People's Organization for Washington Energy Resources v. Washington Utilities and Transportation Commission,* 104 Wash.2d 798, 711 P.2d 319 (1985). Such decisions, however, rested on conclusions about the governing statute, *i.e.,* that it did not deprive the regulatory body of authority to allow amortization.

tions. However, as we have already pointed out, section 520 was enacted in 1985—almost three years after section 1315 was added to the Code. The perceptions and purposes of the legislature in 1985 did not necessarily mirror those which existed in 1982, when section 1315 became law. We have not been presented with any persuasive reason for concluding that they were the same. We are concerned with the legislative intent underlying the 1982 statute, section 1315; for that is the one which applies to the instant matters. We are not here concerned with the legislature's intent, during a later session, in enacting a statute which does not apply to the case before us. Furthermore, any attempt to impute relevance to section 520 cannot ignore the fact that it was made to operate *prospectively only:* Such is an indication that the legislature, in belatedly conferring upon electric utilities a conditional right to recover cancelled plant costs, did not intend for the utilities to have that right prior to the effective date of the 1985 statute.

We turn next to the question of whether the Commission was correct in deciding that Penn Power's rate base could be increased by the amount of its investments in the vacant land. As mentioned, the Commission based its decision on a finding that Penn Power had a definite plan earmarking the unimproved land for use, "within a reasonable time," as sites of transmission lines and substations. The OCA, in disputing the validity of the above ruling, starts with a premise that property owned by a utility may not be included in its rate base unless it is used and useful in the public service. In connection with that proposition, the OCA then focusses on the last sentence of section 1315, which in part here pertinent, states: "[n]o electric utility property shall be deemed *used and useful* until it is *presently providing actual utility service to the customers.*" (Emphasis added.) In the view of the OCA, Penn Power's planned, future use of the vacant land did not render it "used and useful" under the standard dictated by the above

statutory language. This contention was, as noted, rejected by the court below.

 The threshold premise of the OCA's argument concerning the vacant land is legally accurate. One of the cardinal principles of this state's public utility law is that, in the setting of rates for services to the public, a utility company is entitled to a return only on such of its property as is "used and useful" in the public service. *E.g.*, *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission*, 509 Pa. 324, 502 A.2d 130 (1985); *Scranton v. Scranton Steam Heat Co.*, 405 Pa. 397, 176 A.2d 86 (1961); *Erie City v. Public Service Commission*, 278 Pa. 512, 529, 123 A. 471, 478 (1924); *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa.Super. 187, 90 A.2d 607 (1952); *Newport Home Water Co. v. Public Service Commission*, 76 Pa.Super. 386 (1921); *UGI Corp. v. Pennsylvania Public Utility Commission*, 49 Pa.Cmwlth. 69, 410 A.2d 923 (1980); *see* 66 Pa.C.S. § 1310(d). The fact that a utility owns a property does not of itself justify its inclusion in the rate base; and the burden is on the utility to show that the property is "used and useful" in the public service. *City of Pittsburgh, supra.*

Based on the standard set forth by the final sentence of section 1315 of the Code, as to when the property of an electric utility may be deemed *"used and useful,"* we must conclude that the vacant land here in issue does not meet that test. Utility real estate that is vacant and, according to the utility's own plans, might remain so for as long as ten years, cannot reasonably be characterized as property *"presently providing actual utility service to the customers."* [8] We thus hold that the addition of the land investments to Penn Power's rate base violated the terms of

**8.** Penn Power's reliance on our decision in *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 430, 490 A.2d 806 (1985) is misplaced. In that case we held that a utility could properly include in its rate base the cost of nuclear fuel purchased for use in an uncompleted nuclear plant. However, an important fact in the case was that the fuel could also have been used in other facilities that were currently in service. Utilities have traditionally been allowed to recover the cost of usable supplies and materials.

section 1315 of the Code.[9]

## Constitutional Challenges

According to the intervenors, a statute which disallows inclusion of the cancelled plant costs in the rate base, and also bars as an alternative their being treated as operating expenses, works a confiscation of utility property without just compensation, in violation of the federal and state constitutions.

It is of course true that the property of a public utility, though devoted to the public service and convenience, is still private property; and neither the corpus of that property nor the use thereof can be constitutionally taken for a compulsory price which falls below the measure of just compensation. *E.g., United Railways and Electric Co. of Baltimore v. West*, 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390 (1930). This deeply-rooted principle of constitutional law had been articulated in more abbreviated form in the landmark case of *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), in which the Supreme Court of the United States declared that a public utility "may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it." *Id.* at 546, 18 S.Ct. at 433. An even earlier formulation of the same precept is to be found in *Railroad Commission Cases*, 116 U.S. 307, 6 S.Ct. 1191, 29 L.Ed. 636 (1886).

■ The "just compensation" safeguarded to a utility by the fourteenth amendment of the federal constitution is a reasonable return on the fair value of its property at the time it is being used for public service. *Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469 (1938); *Los Angeles Gas Co. v. Railroad Commission*, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180 (1933); *McCardle v. Indianapolis Water Co.*, 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316 (1926); *Board of Commissioners v. New York Bell Telephone Co.*, 271 U.S. 23, 46 S.Ct. 363,

**9.** *See Boston Edison Co. v. Dep't. of Public Utilities*, 375 Mass. 1, 375 N.E.2d 305 (1978) (pointing out that utility was free to sell land at a profit, which would benefit stockholders, not ratepayers).

164

70 L.Ed. 808 (1926); *Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382 (1909); *Pennsylvania Electric Co. v. Pennsylvania Public Utilties Commission, supra.* Thus, the, *return* which a utility is constitutionally entitled to earn relates only to its property that is employed in the public service. *Bluefield Water Works Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *Smyth v. Ames, supra; Railroad Commission Cases, supra.* In that regard, the Supreme Court has held that it is only when a utility's property is *"used and useful"* in the public service does the federal constitution require its inclusion in the rate base, upon which the return is calculated. *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed.1037 (1942); *Denver Union Stock Yard Co. v. United States, supra.* A refined version of the same principle can be found in *Columbus Gas & Fuel Co. v. Public Utilities Commission,* 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327 (1934). There, the Supreme Court held that a utility's rate base need not include assets not presently in use, *"unless the time for using them is so near that they may be said, at least by analogy, to have the quality of working capital." Id.* at 406.

■ In addressing the confiscation argument, we must recognize that a public utility's constitutional right to "just compensation" encompasses not only rate base considerations, but also includes the utility's right to recover from ratepayers the expenses and costs of operation. *West Ohio Gas Co. v. Public Utilities Commission,* 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935); *United Railways and Electric Co. of Baltimore v. West, supra; Smyth v. Ames, supra; Covington & Lexington Turnpike Road Co. v. Sandford,* 164 U.S. 578, 17 S.Ct. 198, 41 L.Ed. 560 (1896). Indeed, a utility's earned return on its rate base is to be measured only after its operating expenses have been deducted from gross revenues; and prescribed rates which are not sufficient to allow recovery of operating expenses, in addition to providing a fair return on the rate base, are confiscatory. *E.g., United Railways and Electric Co. of*

*Baltimore v. West, supra.* However, just as a utility has no constitutional right to have included in its rate base assets which are not "used and useful" in the public service, so too may it be restricted as to what items it can properly claim as operating expenses.

■ In *Lindheimer v. Illinois Bell Telephone Co.,* 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934), the Supreme Court described the "operating expenses" of a public utility as *"the cost of producing the service." Id.* at 167, 54 S.Ct. at 665 (emphasis added). The Court, observing that "[c]harges to operating expenses may be as important as valuations of property," pointed out that an improper inflation of operating expenses would produce the same result as an increase of the allowed rate of return on the rate base. *Id.* at 164, 54 S.Ct. at 663. The Court, in *Lindheimer,* went on to hold that the ratemaking authority could properly exclude from a utility's claimed operating expense the amount of excessive depreciation charges. The depreciation charges there involved were deemed excessive because they went far beyond any realistic measure of the degree to which the utility's plant was being consumed by use in the public service. In the case of *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267 (1934), the Supreme Court held that a state, in fixing rates for a utility, may exclude from reported operating expenses unreasonable amounts which the utility paid to an affiliated company for supplies. *See also Columbus Gas & Fuel Co. v. Public Utilities Commission, supra.* It is thus clear that the federal constitution does not confer upon a public utility the right to claim, for ratemaking purposes, whatever it sees fit to include in the category of "operating expenses." In that regard, the significance of the *Lindheimer* and *Dayton Power & Light Co.* cases may be stated thus: principles of "just compensation" under the federal constitution do not endow a public utility with the right to burden ratepayers with what the utility calls an "operating expense" unless such item, in addition to being reasonable in amount, represents a cost of providing *present* utility service.

We have not been presented with any convincing argument for concluding that the "just compensation" provision of our state constitution compels a broader conception of the nature of an "operating expense." The judicial decisions of this state are not wanting in expressions concerning the type of outlays or cost items which a utility may properly charge to ratepayers as operating expenses. For example, in *Shirk v. Lancaster City*, 313 Pa. 158, 169 A. 557 (1933), this Court generally defined a utility's "operating cost" as including "all charges and expenses involved in the *production, supply and distribution of the commodity.*" *Id.*, 313 Pa. at 171, 169 A. at 563 (emphasis added).[10] Later, in *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 561, 493 A.2d 653 (1985), we indicated that "proper operating expenses" are ones which relate to the *cost of service.* We have also observed, regarding a utility's right to recover expenses, that the policy in this state has been for current ratepayers to bear "only the actual expenses of *providing current utility service*" and that such policy was reaffirmed in the enactment of section 1315 of the Public Utility Code. *Barasch v. Pennsylvania Public Utility Commission*, 507 Pa. 496, 516–17, 491 A.2d 94, 104 (1985) (emphasis added); *see also Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission, supra.* These expressions basically coincide with the mentioned federal view of what kinds of costs a utility is constitutionally entitled to pass to ratepayers under the classification of "operating expenses." Therefore, without the benefit of a valid and otherwise applicable statute conferring a broader right, the only expenses which a public utility in this state may recover from ratepayers, through rates, are those expenses which represent the actual cost of providing *present* utility service. That is so regardless of whatever convenient accounting label the utility might employ to characterize a nonqualifying outlay.

■ It is absolutely clear that the four uncompleted nuclear plants here involved have no capacity to produce any

10. As examples of such expenses, the Court included such items as salaries, telephone, insurance, taxes and stationery.

present utility service to the customers of the two intervenors. Those aborted projects are of no use whatsoever to the public. It should be recalled that in *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission, supra,* we held that a nuclear reactor at Three Mile Island was properly excluded from the utility's rate base because it had been so damaged by a near melt-down as to be useless in the public service. Certainly, no reasonable argument can be made that the four uncompleted plants have any higher degree of usefulness. Given that the terminated plants are so useless as to preclude their being an element of a utility's rate base, we cannot imagine by what magic the intervenors' investments in the useless projects can be considered a cost of providing present utility service as to qualify as "operating expenses." We therefore hold that interpreting section 1315 of the Code as barring the amortization of cancelled plant costs does not work an unconstitutional confiscation of utility property.

▋ As a further constitutional challenge, intervenor Duquesne argues that section 1315 is violative of due process standards because it was made to operate retroactively. We reject this argument as being without merit. Neither the federal constitution nor our state constitution invalidates a non-penal statute merely because it is retroactive, unless such legislation impairs contractual or other vested rights. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); *Kentucky Union Co. v. Kentucky,* 219 U.S. 140, 31 S.Ct. 171, 55 L.Ed. 137 (1911); *League v. Texas,* 184 U.S. 156, 22 S.Ct. 475, 46 L.Ed. 478 (1902); *Campbell v. Holt,* 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885); *Krenzelak v. Krenzelak,* 503 Pa. 373, 469 A.2d 987 (1983); *Smith v. Fenner,* 399 Pa. 633, 161 A.2d 150 (1960). It cannot be said that either Duquesne or Penn Power had a contractual or other vested right to recover from ratepayers the cost of investments which do not provide utility service.

▋ Duquesne also contends that because the title of Act No. 335 does not mention the retroactivity of section

1315 the legislation is invalid. As support for that assertion, the company relies on Article III, section 3 of the Pennsylvania Constitution, which in part states: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title...." This argument must fail. The preceding constitutional provision requires merely that the title of a statute put reasonably inquiring minds on notice of the legislation's contents. *In re Condemnation by Commonwealth, Department of Transportation,* 511 Pa. 620, 515 A.2d 899 (1986); *L.J.W. Realty Corp. v. City of Philadelphia,* 390 Pa. 197, 134 A.2d 878 (1957); *In re Gumpert's Estate,* 343 Pa. 405, 23 A.2d 479 (1942). All that is required is that the title shall contain words sufficient to cause one having a reasonably inquiring state of mind to examine the statute to determine whether he may be affected by it. *Boyertown Burial Casket Co. v. Commonwealth,* 366 Pa. 574, 79 A.2d 449 (1951). Although Act No. 335 does not in its title mention the retroactivity of section 1315, such is expressly set forth in the next-to-last part of the Act. We cannot believe that a statute's title which announces that the legislation is an amendment of the Public Utility Code, and which also mentions *"providing a limitation on the consideration of certain costs in the rate base for electric public utilities,"* would not induce an electric-utility company to examine and study the entire enactment.

 Duquesne and Penn Power join in making the additional assertions that Act No. 335 denies them the equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution, and that the Act also violates the prohibition against "special legislation" set forth in Article III, section 32 of the Pennsylvania Constitution. These arguments are predicated on the fact that Act No. 335, by its terms, applies only to electric-utility companies, and not to other type public service companies such as gas and water utilities. The intervenors contend that, if the public interest is served by protecting utility ratepayers from being burdened with the costs of unproduc-

tive construction projects, a statute which targets only electric utilities in that regard is an unreasonable, and thus unconstitutional, classification.

The equal protection clause of the United States Constitution requires that " 'all persons similarly circumstanced shall be treated alike.' " *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920). Among its various applications, the equal protection clause of the federal constitution forbids a state legislature from imposing on a person, natural or artificial, or on a class, burdens which are not cast upon others similarly situated. *E.g., Atchison, Topeka and Santa Fe R.R. v. Matthews*, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909 (1899). The equal protection of the laws, it has been said, means that the rights of all persons must rest upon the same *rule* under similar circumstances. *Hartford Steam Boiler Inspection and Insurance Co. v. Harrison*, 301 U.S. 459, 461, 57 S.Ct. 838, 839, 81 L.Ed. 1223 (1937); *Louisville Gas & Electric Co. v. Coleman*, 277 U.S. 32, 37, 48 S.Ct. 423, 425, 72 L.Ed. 770 (1928).

The intervenors in the case at bar, in asserting that Act No. 335 denies them the equal protection of the laws, assume that, because the legislation applies exclusively to electric utilities, it will have the effect of requiring only public utilities of that class to bear the burden of aborted construction projects but will permit other type utilities to pass such costs on to their ratepayers. This assumption is palpably erroneous. Given what we have already said about the fundamental principles of this state's public-utility jurisprudence, it should be clear that no utility of any type is permitted, without express and valid legislative authorization, to charge ratepayers for property which is not used and useful in the production of current utility service. In our view, Act No. 335 was mainly an attempt by the 1982 legislature to make clear, by codification, that the above mentioned general principle of utility law should govern the then-ongoing efforts of some electric utilities to recover cancelled plant costs from their customers.

■ There is nothing in Act No. 335 to indicate that the legislature which enacted it, after going to such lengths to make it absolutely clear that the Commission had no authority to allow the electric utilities to recover the costs of uncompleted projects, also intended to abrogate pre-existent legal principles which would compel the same result with respect to other type public utilities. Indeed, the very last sentence in section 2 of the Act expressly states: "Nothing contained in this act shall be construed to modify or change *existing law* with regard to the rate making treatment of investment in facilities of *fixed utilities other than electric utilities.*" (Emphasis added.) We read this proviso to mean that, although the Act focusses on electric utilities, such does not mean that other type utilities are relieved of the proscriptions of pre-existing law concerning the recovery of costs. Thus, Act No. 335 has no disparate impact on electric utilities; and, for that reason, we conclude that the statute does not deny the intervenors the equal protection of the laws. *See Califano v. Boles,* 443 U.S. 282, 99 S.Ct. 2767, 61 L.Ed.2d 541 (1979); *National Union of Marine Cooks & Stewards v. Arnold,* 348 U.S. 37, 75 S.Ct. 92, 99 L.Ed. 46 (1954). In determining whether the equal protection guaranteed by the federal constitution has been afforded, consideration must be given to the entire body of law operating upon the subject matter in issue. *See Interstate Busses Corp. v. Blodgett,* 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551 (1928); *Farmers and Mechanics Savings Bank v. Minnesota,* 232 U.S. 516, 34 S.Ct. 354, 58 L.Ed. 706 (1914); *see also Louisville Gas & Electric Co. v. Coleman, supra,* at 50 (Brandeis, J., dissenting).

Regarding the bar against "special legislation" contained in Article III, section 32 of the Pennsylvania Constitution, this Court has held that the provision, in its meaning and purpose, is sufficiently similar to the equal protection clause of the United States Constitution as to warrant like application. *Laudenberger v. Port Authority of Allegheny County,* 496 Pa. 52, 67 n. 13, 436 A.2d 147, 155 n. 13 (1981); *Baltimore & Ohio R.R. v. Commonwealth, Department of Labor & Industry,* 461 Pa. 68, 334 A.2d 636 (1975). There-

fore, the same considerations that invalidate the intervenors' reliance on the federal guarantee also defeat their resort to the analogous provision in our state constitution.

We hold that the Public Utility Commission exceeded its lawful authority in allowing Duquesne and Penn Power to amortize the costs of the cancelled construction projects. We also conclude that the Commission erred likewise in permitting Penn Power to add to its rate base the cost of its investments in the vacant land here involved. It is clear, beyond any need for citation, that the function of ratemaking for public utilities is legislative in nature. The Commission is but an instrumentality of the state legislature for the performance of that function; and the agency has only such powers as are expressly conferred upon it by statute or exist by necessary implication. *E.g., City of Philadelphia v. Philadelphia Electric Co.,* 504 Pa. 312, 473 A.2d 997 (1984). By entering the decisions here reviewed, the Commission not only failed to apply long-established principles of public utility law, but also failed to heed the legislature's statutory re-confirmation of them with respect to the costs at issue in these cases.

For the reasons set forth herein, the orders of the Commonwealth Court are reversed. These causes are hereby remanded to the Commission for proceedings consistent with this opinion.