645 A.2d 912

**Irwin A. POPOWSKY, Consumer Advocate, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 11, 1994.

Decided July 11, 1994.

Petition for Allowance of Appeal Granted Nov. 28, 1994.

---

Craig R. Burgraff, Sr. Asst. Consumer Advocate, for petitioner.

Kevin J. Moody, Asst. Counsel, for respondent.

W. Edwin Ogden, for intervenor.

Before CRAIG, President Judge, DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

CRAIG, President Judge.

The Office of Consumer Advocate (OCA) appeals an order of the Pennsylvania Public Utility Commission granting Metropolitan Edison (MetEd) Company's petition for clarification, reconsideration and amendment of a previous commission order which had denied MetEd's request for recovery of the costs of decommissioning[1] a nuclear generating facility, Three Mile Island 2 (TMI 2).

The OCA presents the following question on appeal: Did the commission err as a matter of law or abuse its discretion in allowing an electric utility to charge current ratepayers for the cost of decommissioning[2] a nuclear power plant which does not presently provide, and will not in the future, provide useful service to those ratepayers?

## FACTS

The facts, as found by the commission, follow. On April 24, 1992, MetEd, a public utility corporation which provides electric service to customers in Pennsylvania, filed with the commission Supplement No. 26 to Tariff Electric Pa.P.U.C. No. 45. Supplement No. 26, which MetEd proposed to become effective on June 23, 1992, requesting an increase in MetEd's electric rates in order to produce $68,022,000 in additional annual revenues (9.4% increase in base rate revenues for electric customers). MetEd proposed a $13 million reduction in its state tax adjustment surcharge and energy cost rate,

1. An expert in nuclear engineering testified for OCA in a hearing before an administrative law judge in this case and defined decommissioning as a safe means of removing a nuclear facility from service by reducing the plant's residual radioactivity to a level which allows release of the nuclear property for unrestricted use. (R. 8a).

2. The OCA uses the word "decommissioning" in reference to both 1) radiological decommissioning costs and 2) costs of removing nonradiological facilities and structures of the nuclear plant.

which would result in a net increase of $55 million in MetEd's annual revenues.

MetEd owns fifty percent of Three Mile Island 1 (the sister nuclear plant unit of TMI 2) and TMI 2. Because of an accident on March 28, 1979, TMI 2, which had only been in service for approximately three months, was disabled and has not been in service after that date. TMI 1 was not damaged in that accident and is scheduled to go out of service in 2014, the year decommissioning also was scheduled to begin for TMI 2. In Supplement No. 26, MetEd included a claim for decommissioning expenses in the amortization plan to remove TMI 2 (of the $68 million annual increase noted above, approximately 42.712 million represented the cost of decommissioning TMI 2: $29.112 million to remove the unit, $10.6 million for radiological and nonradiological costs of removal, and $3 million for estimated annual monitored storage costs).

OCA, the Office of Small Business Advocate, GPU Industrial Intervenors and several of MetEd's customers filed complaints to MetEd's Supplement No. 26.

The commission suspended MetEd's filing of the supplement until January 23, 1993, so that the commission could conduct an investigation of the reasonableness of the proposed rates as well as MetEd's rates at that time.

On July 22, 1992, an administrative law judge conducted a prehearing conference on the general rate increase proceeding. The administrative law judge then held over two weeks of formal evidentiary hearings in which MetEd and the other parties presented witnesses. Two public input hearings were also held to address the rate increase: one hearing in York, Pennsylvania on September 2, 1992 and one in Reading, Pennsylvania on September 3, 1992.

The judge then issued a recommended decision that the commission allow MetEd an increase of $20,617,000 in additional annual revenues, basing that figure on a finding that MetEd had shown a need for a total of $744,151,000 annual operating revenues.

All parties to the proceedings filed exceptions to the administrative law judge's recommendation.

At a public meeting held on January 7, 1993, the commission voted informally to deny MetEd's request for decommissioning expenses for TMI 2. The commission thereafter formally adopted that vote and denied the request for TMI 2 decommissioning expenses. By final order dated January 21, 1993, the commission rejected the administrative law judge's recommendation that the commission allow MetEd to recover decommissioning costs for TMI 2, concluding that 1) MetEd's ratepayers had already made significant contributions to the non-accident costs of TMI 2, and 2) the MetEd's proposed costs for decommissioning TMI 2 would be an increment for which ratepayers have received no benefit. The commission allowed MetEd approximately one-half of MetEd's requested $68 million request.

MetEd filed with the commission a petition for clarification, reconsideration and amendment of the commission's order, reducing its request for decommissioning costs to approximately $10 million. In an order dated April 15, 1993, the commission granted the petition in part, accepting the modified proposal which allowed MetEd to recover the cost of decommissioning TMI 2 through an increase in electric rates to MetEd's electric customers.

OCA's appeal of the commission's April 15, 1993 order, allowing decommissioning costs, is now before this court.

## ANALYSIS

█ In reviewing the commission's findings and conclusions, this court's scope of review is limited to determining whether constitutional rights were violated, an error of law committed, and whether the findings of fact are supported by substantial evidence. *Johnstown–Pittsburgh Express, Inc. v. Public Utility Commission*, 5 Pa.Commonwealth Ct. 521, 291 A.2d 545 (1972).

OCA argues that the commission's allowance of TMI–2 Costs violates Pennsylvania public utility law in that no utility,

without express and valid legislative authorization, is permitted to charge ratepayers for costs on investment which is not used and useful in production of current utility service.

66 Pa.C.S. § 1315 states in relevant part:

Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or as may be required to convert facilities to the utilization of coal, the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility *is used and useful in service to the public.* Except as stated in this section, *no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.*

(Emphasis added.)

In *Barasch v. Public Utility Commission,* 516 Pa. 142, 532 A.2d 325 (1987), a public utility wanted to include, in its electrical rates to its customers, expenses the utility had incurred from a partial construction of four nuclear plants, where the project was later cancelled. The Pennsylvania Supreme Court, in denying the rate increase, noted that, under section 1315, a public utility, in setting rates, is entitled to a return only on its property which is "used and useful" in public service, meaning that the property must, at the present time, provide actual utility service to customers.

However, the commission argues that, although TMI 2 does not provide used or useful service to the ratepayers, the commission correctly allowed decommissioning costs in the base rate because 1) the explicit language of § 1315 pertains to costs of "construction or expansion of a facility," and not decommissioning costs involved in retiring a facility, and 2) decommissioning costs are recoverable because those costs may be characterized as *operating expenses,* or expenses

which were a necessary and reasonable cost of doing business, which a utility is allowed to include in its rates, pursuant to 66 Pa.C.S. § 1301, which gives the commission authority to fix just and reasonable rates. The commission noted in its April 15, 1993 order:

> The Company's shareholders voluntarily absorbed $40 million in decommissioning costs which exceeded the TMI-1 decommissioning level.... No party has argued in this proceeding that the remainder of the balance of the TMI-2 decommissioning costs are related to the accident at TMI-2. The obligation to decommission the plant was, in fact, an obligation imposed on Met-Ed as soon as the nuclear fuel was loaded at the plant and the plant became radiologically contaminated.... This event occurred substantially before the 1979 accident.... For these reasons, it is a misnomer to label the decommissioning costs as accident-related, and therefore, our 1979 pronouncement relied upon by the OCA and the OTS does not provide the appropriate guidance on the question of whether ratepayers or shareholders must bear some portion of this financial responsibility.... The appropriate analysis to consider is whether the decommissioning costs are a necessary and reasonable cost of doing business.... there is no dispute that the $8.302 million is the amount of decommissioning costs that the Company would have incurred, whether or not the accident happened.... Consequently the apportionment of the costs of TMI-2 decommissioning between the shareholders and ratepayers in the manner proposed by the ALJ and now reiterated by the Company, would strike the appropriate balance and be consistent with the public interest.

*Public Utility Commission v. Metropolitan Edison Company,* 141 PUR 4th 321, 325 (1993).

The commission cites *Pennsylvania Electric Co. v. Public Utility Commission,* 509 Pa. 324, 502 A.2d 130 (1985) (*Penelec*), in arguing that the commission has authority under traditional ratemaking principles, to allow legitimate, necessary and reasonable operating expenses in base rates for utility service, even though the utility is not used and useful in

providing utility service to ratepayers. In *Penelec,* the Pennsylvania Supreme Court upheld the commission's decision to eliminate, from the electricity base rates, costs associated with TMI 1, which was then not in service, and to allow recovery for operating expenses associated with maintaining the non-used and non-useful TMI 1 plant, in order to restart the unit. The commission notes that the court in *Penelec* reasoned that allowing a recovery for operating expenses involved a balancing of the interests of both the consumers and the investors in setting just and reasonable rates.

The commission thus notes that, in this case, the decommissioning costs for TMI 2 may be considered a part of MetEd's operating expenses for the unit and thus may be included in the base rate. In its April 15, 1993 order now on appeal, where the commission granted MetEd's petition for reconsideration, the commission reasoned that:

> In the instant case, we have determined that while TMI–2 remains non-used and useful, and no return on the Company's investment will be allowed, the balancing of the interests between consumers and investors as to decommissioning costs has led to the conclusion that these are necessary and reasonable costs unrelated to the accident at TMI–2 that can be fairly and legally included in the establishment of just and reasonable rates.

*Public Utility Commission v. Metropolitan Edison Company* 141 PUR 4th at 326.

However, in its prior January 21, 1993, order, the commission had concluded that:

> Amid all the arguments about the financial impact of refusing to allow the TMI–2 decommissioning costs is an important ratemaking principle that does not deserve to get lost in the shuffle: the principle of balancing *ratepayer and shareholder concerns. Ratepayers have already paid* about $125 million for the costs of the TMI–2 accident clean up, and have paid about $443 million for the plant costs. Ratepayers have also paid replacement power costs.... The majority's decision to refuse to recognize in rates the de-

commissioning costs of TMI–2 must be viewed in this perspective. Ratepayers have already paid their fair share of the costs following the accident. There is no legal or policy justification to require them to bear the costs of decommissioning the crippled plant.

*Public Utility Commission v. Metropolitan Edison Company,* 141 PUR 4th 336, 410 (1993). (Emphasis added.)

In *Barasch,* the Supreme Court noted that "operating expenses" of a public utility means the "cost of producing the utility service" to the customers. *Barasch,* 516 Pa. at 159, 532 A.2d at 336, citing *Lindheimer v. Illinois Bell Telephone Co.,* 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934). The *Barasch* court noted:

It is thus clear that the federal constitution does not confer upon a public utility the right to claim, for ratemaking purposes, whatever it sees fit to include in the category of "operating expenses." . . . principles of "just compensation" under the federal constitution do not endow a public utility with the right to burden ratepayers with what the utility calls "operating expense" unless such item, in addition to being reasonable in amount, represents a cost of providing *present* utility service.

*Id.* (Emphasis in original.)

The court further noted that "operating expenses" includes expenses relating to, producing, supplying, and distributing a commodity. *Id.* at 160, 532 A.2d at 337. The court thus concluded that, because the four uncompleted nuclear plants had no capacity to produce any present utility service to customers, the expenses the utility incurred by starting the construction of the plants, could not be included in the utility's base rates to its customers. That court further noted that it had held in another case that, where the nuclear reactor at TMI 2 had been damaged by the accident, the costs from the accident had to be excluded from the utility's base rate because the utility had been rendered useless in the public service. *Id.*

*Penelec,* on which the commission relies, is distinguishable from this case because in that case the Supreme Court allowed an increase in the base rate for operating expenses associated with maintaining the non-used and non-useful TMI 1 plant in order to restart the unit. The operating costs in *Penelec* were thus based on costs associated with maintaining and restarting a nuclear unit that would at some time in the future provide useful service to customers, although the plant had been non-useful at that time.

In the present case, TMI 2 will not now or ever provide utility service to MetEd's customers. The ratepayers have received service for only three months and hereafter will not receive energy generated by TMI 2, and thus, under *Barasch,* the costs of decommissioning the unit may not be included in MetEd's utility rates. In addition, *Barasch* defines "operating expenses" as costs incurred in providing *present* utility service to customers. The commission may not charge ratepayers for the decommissioning of a unit which does not and will not in the future provide useful service.

Also, as the commission has noted, ratepayers have already paid millions for the construction costs of TMI 2 and costs to clean up the unit after the accident. A balancing of the interest between shareholders and consumers must take into account that it would be unreasonable for the commission to require ratepayers to bear the cost of decommissioning a unit which had a life expectancy of approximately forty years and produced energy to customers for only three months, after the customers have already substantially contributed to other costs associated with the crippled nuclear unit.

Thus, this court concludes that the commission erred as a matter of law in including decommissioning costs for TMI 2 in the electrical rates to MetEd's customers.

Accordingly, this court reverses the commission's April 15, 1993 order allowing MetEd to include the costs of decommissioning TMI 2 in its electric rates to its customers, and this case is remanded to the commission to re-calculate MetEd's

base rate increase without allowing recovery for the decommissioning costs.

## ORDER

NOW, July 11, 1994, the decision of the Pennsylvania Public Utility Commission, dated April 15, 1993, at No. R–00922314, is reversed, and this case is remanded to the commission to recalculate MetEd's base rate increase without allowing recovery for the decommissioning costs.

Jurisdiction relinquished.