562 A.2d 414

**David M. BARASCH, Consumer Advocate, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

**Thomas E. STAFFARONI, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 5, 1989.

Decided July 18, 1989.

Reargument Denied Sept. 27, 1989.

Scott J. Rubin, Asst. Consumer Advocate, Harrisburg, Pa., for petitioner.

Anthony C. Lomma, John H. Appleton, Nogi, Appleton, Weinberger & Wren, Scranton, Pa., for Factoryville Water Co. (Notice of Intervention).

Daniel Delaney, Chief Counsel, Michael C. Schnierle, Dep. Chief Counsel, Bohdan R. Pankiw, Kevin J. Moody, Asst. Counsel, Harrisburg, Pa., for Pa. Public Utility Com'n.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, COLINS, PALLADINO, McGINLEY and SMITH, JJ.

DOYLE, Judge.

Before us for consideration are two consolidated appeals which question the right of a public utility to recover the costs of facilities not presently used and useful in order to ensure repayment of principal and interest on a loan made by the Water Facilities Loan Board (Loan Board)[1] pursuant to the Water Facilities Restoration Act (Water Act).[2] Specifically, we must decide whether our Supreme Court's decision in *Barasch v. Pennsylvania Public Utility Commission*, 516 Pa. 142, 532 A.2d 325 (1987), *aff'd sub nom.*, *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), which bars a utility, absent express legislative authorization, from including in its rates, in any manner, the cost of property which is not used and useful in providing utility service to current ratepayers, controls this case; or, whether the provisions of Section

1. Section 15 of the Pennsylvania Infrastructure Investment Authority Act, Act of March 1, 1988 (Act 16), transferred the rights, powers, duties, and obligations of the Loan Board to the Pennsylvania Infrastructure Investment Authority.
2. 32 Pa.C.S. § 7501–7518.

7518 of the Water Act, 32 Pa.C.S. § 7518,[3] provide the express legislative authorization required by *Barasch.*

The genesis of this case was the November 27, 1987 filing with the Public Utility Commission (Commission) of a request for a rate increase of $36,366 by Factoryville Water Company[4] (Factoryville). The total amount of the increase represents the annual repayment of principal and interest of a loan obtained by Factoryville from the Loan Board pursuant to the Water Act.[5]

In response, Thomas E. Staffaroni, a Factoryville customer and one of two petitioners herein, filed a formal complaint with the Commission. He alleged therein that the requested increase should be denied because, *inter alia,* the facilities financed by the loan were not used and useful in providing utility service to current ratepayers. Following several hearings, an Administrative Law Judge (ALJ) issued a recommended decision on March 31, 1988, in which he found that with the exception of two fire hydrants totalling $4,000 in value, none of the facilities financed by the loan were used and useful in providing utility service, and recommended that the increased tariff be rejected.[6]

**3.** Section 7518 of the Water Act was incorporated without change into Act 16 by Section 14 of Act 16. *See supra* note 1.

**4.** Factoryville is an intervenor before this Court pursuant to Pa.R.A.P. No. 1531(a) which provides that "[a] party to a proceeding before a government unit ... may intervene as of right ... by filing a notice of intervention ... within 30 days after notice of the filing of the petition for review."

**5.** The requested increase of $36,366 represents the annual repayment, payable in monthly installments of $3,030.54, of a $325,000 loan at 9.0185 percent interest over an eighteen year, three-month period. The rate hike represents a 118 percent increase above current rates.

**6.** Factoryville's transmission line from its water source was installed prior to 1928 and travels through two swamps, making leak detection very difficult. The instability of the swamp bed and the corrosive swamp water promote leaks and breaks. In order to remedy these problems, Factoryville applied to the Loan Board for financing of needed improvements. Following required engineering and feasibility studies, Factoryville adopted the recommendations contained therein which included development of a new well and construction of a new storage tank closer to the distribution system. Factoryville applied to the Loan Board for financing and its application was approved. Following consultations with engineers, geologists and the

Thereafter, on April 29, 1988, the Commission entered a summary form opinion and order which rejected the ALJ's recommendation. The Commission found Factoryville's proposed rates to be just and reasonable despite the barium contamination and disagreed with the ALJ's conclusion that facilities constructed with the proceeds of a Water Act loan must be in service as a condition precedent to recovery from the ratepayers of the funds needed to repay principal and interest to the Loan Board. The requested rate increase went into effect with this order.

Following the Commission's order, the Office of Consumer Advocate, the second petitioner herein, intervened on May 6, 1988 before the Commission in order to represent the interests of all of Factoryville's customers. Both petitioners filed petitions for reconsideration of the summary form order and, after a public meeting, the Commission declined by a tie vote to reconsider that order. Petitions for review were timely filed with this court by both petitioners, and consolidated by our order.[7]

■ Petitioners contend that the Commission erred in permitting Factoryville to recover the costs of facilities not presently used and useful[8] in providing utility service, and

Department of Environmental Resources (DER), a well site was developed and a well was drilled. Thereafter, a DER required 48–hour pump test was run, resulting in a water sample which met DER standards. DER issued a public water supply permit and a 200,000 gallon storage tank was constructed along with other improvements, all financed by the money received from the Loan Board. However, before the new well was placed in service it was retested and found to have unacceptably high levels of barium. The new well has been used only once since, to supply water for sanitary purposes (not human consumption) during a period of low water pressure in Factoryville's old system.

7. On August 5, 1988, the Commission issued a long form opinion and order to provide a factual and legal basis for its earlier summary form order. For purposes of our review, we will consider the long form order as a supplement to the summary form order. It was the summary form order which effected the requested rate increase and it therefore represents the final order necessary for our exercise of appellate jurisdiction.

8. There does not appear to be any dispute that the facilities herein at issue are not used and useful in providing utility service. The ALJ's recommended decision stated that with the exception of two fire

cite our Supreme Court's decision in *Barasch* as support for that proposition. In *Barasch,* the Court held that two electric utilities were prohibited from recovering the costs from ratepayers of cancelled nuclear plants which were not used and useful in providing service, either by making such costs part of their rate base or by converting them into operating expenses through amortization. The Commission, however, declined to apply *Barasch* to the instant case, and stated in its long form opinion and order that while *Barasch* was applicable to electric utilities, it was not applicable to a water utility such as Factoryville.

We disagree. It is clear that *Barasch* first is a restatement in case law of the long-held premise that property owned by a utility may not be included in its rate base unless it is used and useful in the public service. As the supreme court summarized:

> One of the cardinal principles of this state's public utility law is that, in the setting of rates for services to the public, a utility company is entitled to a return only on such of its property as is 'used and useful' in the public service. . . . The fact that a utility owns a property does not of itself justify its inclusion in the rate base; and the burden is on the utility to show that the property is 'used and useful' in the public service.

*Barasch,* 516 Pa. at 162, 532 A.2d at 334–35 (citations omitted).

The court next made it clear that the used and useful principle applies to all Pennsylvania public utilities, not merely the electric utilities which were parties to *Barasch.* The utilities in that case contended that Section 1315 of the Public Utility Code (Code), 66 Pa.C.S. § 1315 (prohibiting the inclusion in rates of property which is not used and

hydrants none of the facilities financed by the Loan Board were used and useful. The Commission's summary form order did not dispute this conclusion nor did the Commission enter any contrary findings of fact, and its long form order specifically stated that the facilities are currently unusable and unproductive.

useful), denied them equal protection because that Section applied only to electric utilities. The court found this argument "palpably erroneous," and stated further that:

Given what we have already said about the fundamental principles of this state's public-utility jurisprudence, it should be clear that *no utility of any type is permitted, without express and valid legislative authorization, to charge ratepayers for property which is not used and useful in the production of current utility service.*

*Barasch,* 516 Pa. at 169, 532 A.2d at 338 (emphasis added). Finally, the Court also made it clear that the principle applied to all utility property, "regardless of whatever convenient accounting label the utility might employ to characterize a nonqualifying outlay." *Id.* at 166, 532 A.2d at 337.

Given the above, we believe that the Commission erred as a matter of law by failing to apply the *Barasch* holding to the instant case. As such, Factoryville's ratepayers may not be required to foot the bill for the presently unusable facilities unless the General Assembly has expressly authorized such a charge.

■ The Commission contends that the General Assembly has provided just such an express authorization in Section 7518 of the Water Act, 32 Pa.C.S. § 7518. That Section states that:

*For the limited and special purpose of ensuring repayment of principal and interest on loans made pursuant to this chapter, the Public Utility Commission shall approve such security issues, affiliated inter*est agreements and *rate increase requests as are necessary and appropriate.* For this purpose, the Public Utility Commission shall establish such expedited practices, procedures and policies as necessary to facilitate and accomplish repayment of the loans. *Nothing in this chapter shall be construed as to require approval of*

*rate increases greater than that necessary to accomplish the repayment of loans made pursuant to this chapter.*

(Emphasis added.) The Commission also points to the legislative findings contained at Section 7503 of the Water Act, 32 Pa.C.S. § 7503, as additional support for this proposition.[9]

According to the Commission, the General Assembly has, through these two Sections of the Water Act, "committed to the Commission's sound discretion the responsibility to determine when a rate increase is convenient, essential or suitable to accomplish repayment of [a Water Act] loan, whether or not the facilities constructed with the loan proceeds are 'used and useful' in the traditional ratemaking sense." Restricting its authority in rate cases of this type to strict application of the used and useful principle would, argues the Commission, be contrary to the purposes of the

---

9. **7503. Legislative findings and purposes**
The General Assembly finds and declares that:

(1) The health, safety and welfare of the citizens of this Commonwealth and the economic development, employment, agriculture, industry, environmental quality and government of the entire Commonwealth are and will continue to be vitally affected by the adequacy, safety and effectiveness of dam and reservoir, water supply, flood control and port facilities throughout this Commonwealth.

(2) Many community water supply systems, flood control facilities and port facilities have experienced severe difficulties complying with State and Federal health and safety standards and are not adequate to serve effectively the present and future needs of the people of this Commonwealth.

(3) Adequate financing of necessary repair, reconstruction, rehabilitation and improvement projects is not available at present through existing financial arrangements under terms and conditions which would enable the projects to be implemented.

(4) The Commonwealth should act to assist municipalities and the owners and operators of community water supply systems, flood control facilities and port facilities in the planning, financing and implementation of repair, construction, reconstruction, rehabilitation, extension and improvement projects.

(5) For these reasons and for this purpose, the voters of this Commonwealth approved by referendum on November 3, 1981 the incurring of indebtedness of $300,000,000 through the sale of general obligation bonds by the Commonwealth for loans to provide for these projects.

Water Act and would render it nugatory for most small water facilities.

We do not agree. The plain language of Section 7518 requires only that the Commission approve such rate increases as are necessary and appropriate. That the General Assembly failed to indicate what factors should guide the Commission in determining whether a rate increase is necessary and appropriate does not commit to the Commission the unfettered discretion to make that determination. Rather, the Commission's determination is governed by the provisions of the Public Utility Code, 66 Pa.C.S. §§ 101–3315, and the fundamental principles of our public-utility jurisprudence.

Section 1301 of the Code, 66 Pa.C.S. § 1301, provides that "[e]very rate ... shall be just and reasonable." When attempting to set these "just and reasonable" rates, the Commission is guided by general ratemaking principles, including the "used and useful" principle. The Commission contends, however, that the General Assembly's failure to specify in Section 7518 of the Water Act that rate increases to ensure payment of Water Act Loans be granted subject to existing ratemaking principles constitutes the valid and express legislative authorization to grant such rate increases without regard to the used and useful principle. To the contrary, we believe that if the General Assembly had intended that the Commission grant rate increases to ensure payment of Water Act Loans *without* regard to existing ratemaking principles, it need merely have so stated in the Water Act. We refuse to read into the Water Act an abrogation of either the Public Utility Code or established ratemaking principles without the express legislative statement required by *Barasch*.

Further, the Commission argues that our refusal to vest in it broad discretion to approve rate increases without regard to existing ratemaking principles would result in reluctance by the Loan Board to extend credit to small

552

water utilities. We find this argument unpersuasive. In general, the Water Act provides for in Section 7517, 32 Pa.C.S. § 7517, security from default, and in Section 7514, 32 Pa.C.S. § 7514, a thorough examination of both the project and the borrower's credit worthiness. It does not make potential approval of rate increases by the Commission a criterion for loan approval.[10]

Accordingly, the order of the Public Utility Commission granting the rate increase requested by Factoryville Water Company is reversed.[11]

## ORDER

NOW, July 18, 1989, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is reversed.

PALLADINO, J., dissents.

10. With regard to the case *sub judice,* we believe this factual scenario to be the exception rather than the rule and note that although the facilities herein are currently unproductive, Factoryville's owner testified that with a small additional expenditure the facilities could become used and useful. Further, the Commission's portrayal of Factoryville as a single entity with limited assets is somewhat misleading. While the assets of Factoryville may be limited, we note that Factoryville's parent corporation, North Penn Utilities (North Penn), has thirty operating subsidiaries (twenty-seven water companies and three sewer companies) and assets approximating six million dollars. North Penn is the sole common shareholder of Factoryville and, in fact, guaranteed the repayment of the Water Act loan. As such, we reject the Commission's argument that strict application of the used and useful principle would render the Water Act nugatory for most small water facilities.

11. The Commission also argues that its grant of Factoryville's requested rate increase as necessary and proper is supported by substantial evidence. However, because of our disposition of this matter we need not reach this issue. We note, however, that requiring the ratepayers in this case to shoulder the entire burden of the debt service through a 118 percent rate increase seems neither necessary nor appropriate. *See supra* note 10.