**EMPORIUM WATER COMPANY,**
**Petitioner**

**v.**

**PENNSYLVANIA PUBLIC UTILITY**
**COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 8, 2008.

Decided June 4, 2008.

Publication Ordered Aug. 14, 2008.

Thomas J. Sniscak, Harrisburg, for petitioner.

Stanley E. Brown, Harrisburg, for respondent.

Christine Maloni Hoover, Harrisburg, for intervenor, Office of Consumer Advocate.

BEFORE: FRIEDMAN, Judge, COHN JUBELIRER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

In this case we determine whether Emporium Water Company (Utility) should be allowed to use a "hypothetical capital structure" in calculating the utility's proper rate of return. Utility appeals from the Order of the Pennsylvania Public Utility Commission (PUC), issued December 28, 2006 (December Order), which, *inter alia,* concluded that Utility could not use a

hypothetical capital structure, but must use the Utility's "actual capital structure".[1]

Utility is a private Pennsylvania corporation that serves approximately 1,466 customers in and around the Borough of Emporium (Borough), Cameron County, Pennsylvania. Utility's actual capital structure is 69.24% debt to 30.76% equity.[2] Utility has current annual debt payments of $201,328. This amount consists of principal and interest payments on: (1) a loan from PennVest[3]; and (2) a loan from First National Community Bank (FNCB). It also includes payments of interest alone (and not principal) on: (1) notes from the owner/shareholder; (2) a note from one of the owner's non-utility companies; and a(3) second loan from FNCB.

The gist of Utility's argument is that it bears a heavy debt load and that the rates allowed by the PUC do not give the utility sufficient funds to service its debt, let alone obtain a return of profit. The present appeal arises from two Supplemental Tariffs that Utility filed in March 2006 for the purpose of raising its revenue stream to better service its debts and still return a moderate rate of profit.[4]

---

1. Utility also appeals from the PUC's Order dated April 24, 2007 (April Order) that denied Utility's request for reconsideration of the December Order.

2. The term "capital structure" means ratio of debt to equity. *Popowsky v. Pennsylvania Public Utility Commission,* 868 A.2d 606, 613 (Pa.Cmwlth.2007). The term "hypothetical capital structure" means making adjustments to the ratio of debt to equity, to obtain a fair result. *Lower Paxton Township v. Pennsylvania Public Utility Commission,* 13 Pa.Cmwlth. 135, 317 A.2d 917, 921 (1974). The term "actual capital structure" means using a utility's real capital structure ratio.

3. PennVest is the Pennsylvania Infrastructure Investment Authority established by the Pennsylvania Infrastructure Investment Authority Act (PennVest Act), Act of March 1, 1988, P.L. 82, *as amended,* 35 P.S. §§ 751.1–751.20 (PennVest Act). PennVest is taxpayer fi-

nanced and, *inter alia,* provides low cost loans to improve and provide drinking water. PennVest loans typically carry an interest rate of 1%, which is substantially lower than other types of financing generally available to utilities.

4. Various issues as to Utility's rates have been previously addressed by this Court. *Emporium Water Co. v. Public Utility Commission,* 859 A.2d 20 (Pa.Cmwlth.2004); *Popowsky v. Pennsylvania Public Utility Commission,* 805 A.2d 637 (Pa.Cmwlth.2002) (en banc). The PUC and Utility had agreed to use a hypothetical structure in an agreement that we struck down on other grounds in *Popowsky,* because no hearing had been held regarding the settlement agreement. The subsequent appeal addressed matters relating to the refunding of overpayments that customers had made under the stricken settlement agreement. *Emporium Water Co.* The present appeal appears

In March 2006, Utility filed with PUC Supplement No. 20OR (20OR) to Tariff Water–Pa P.U.C. No. 5, to become effective on May 29, 2006. In 20OR, Utility sought to increase base annual rate revenues of $342,092 (a 53.9% increase). This rate was based on the "operating ratio methodology." Operating ratio methodology is defined in the applicable regulations as:

> This ratemaking method develops a revenue requirement where little or no rate base exists. The operating ratio at present rates shall be calculated as a ratio of operating expenses to operating revenues, where the numerator shall include operations and maintenance expense, annual depreciation on noncontributed facilities, amortization of multiyear expenses and applicable taxes and the denominator shall consist of the utility's operating revenues at present rates.

52 Pa.Code § 53.54(b)(1). Per subparagraph (b)(4) of Section 53.54 the operating ratio methodology is available for "water . . . utilities with annual gross revenues . . . of less than $250,000." 52 Pa.Code § 53.54(b)(4). Emporium's annual gross revenues exceeded the $250,000 limitation of subparagraph (b)(4). Accordingly, in conjunction with 20OR, Utility filed a Petition for Waiver (Waiver Petition), which asked the PUC to waive 52 Pa.Code § 53.54(b)(4) and allow Emporium to present the operating ratio methodology as an alternative in its current base rate case.

At the same time, Utility filed an alternative supplement to the 20OR, Supplement 20RR (20RR), which was also to become effective on May 29, 2006. This rate was based on the traditional rate base/rate of return methodology.[5] In 20RR, Utility sought to recover an estimated annual increase in base rate revenues of $316,144 (a 49.85% increase) in the Company's annual revenues at present rates.

The Office of Consumer Advocate (Advocate) (Intervenor in the present appeal) and the Office of Trial Staff (OTS) each filed an answer opposing the Waiver Petition and filed complaints against both 20OR and 20RR. The Borough, as well as the Office of Small Business Advocate, also opposed the proposed rate increases.

By order issued in June 2006, the PUC denied the Waiver Petition. Relatedly, the PUC rejected 20OR. The PUC also suspended implementation of 20RR until December 29, 2006, and began an investigation into the rate.

The case was assigned to an Administrative Law Judge (ALJ). The parties submitted testimony and exhibits, including expert testimony, and consented to the admission of each other's evidence. The ALJ considered the evidence and decided the case without conducting a hearing. In the resulting recommended decision, the

to be the first time before this Court that Utility is arguing why a hypothetical capital structure should be utilized.

5. "The basic ratemaking formula by which the PUC fulfills this duty provides that a utility's revenue requirement (RR) is equal to the amount of proper expenses (E) plus a reasonable rate of return (ROR) on the rate base (RB): RR = E + ROR(RB)." *Pennsylvania Power Co. v. Pennsylvania Public Utility Commission*, 127 Pa.Cmwlth. 97, 561 A.2d 43, 46 (1989). The term expenses "include[s] such items as the cost of operations and maintenance (labor, fuel and administrative costs, e.g.), depreciation and taxes." *Id.* The term "rate of return" means "a rate determined by the PUC to allow the shareholders the opportunity to earn a reasonable return, or profit, on their rate base investment, in view of the level of risk involved." *Id.* at 47. The term "rate base" means "the value of the property of the utility that is used and useful in providing utility service." *Id.*

ALJ recommended an annual increase of no more than $220,862. The ALJ suggested an overall rate of return of 5.28% utilizing Utility's actual capital structure consisting of 69.24% long term debt and 30.76% common equity. The ALJ also recommended denying an expense claim Utility made for $11,549 to cover wages for part-time employees.

Utility filed exceptions with the PUC, arguing that the ALJ's decision failed to make necessary adjustments to take into account Utility's atypical capital structure, resulting in a rate of return that was so low as to be confiscatory. Utility argued that the 5.28% overall return resulted in no monies available for profit. The PUC, in its Opinion and Order entered December 28, 2006 (PUC Opinion), largely adopted the recommended decision, with some modifications. The December Order resulted in additional operating revenues not to exceed $238,639. The PUC disagreed with the ALJ recommendation as to part-time employees, and allowed total compensation not to exceed the $11,546 claimed on the record.[6] The PUC concluded that Utility's shareholders faced greater financial risks than a typical water company's shareholders do, and slightly increased the ALJ's recommended return on equity. The December Order resulted in total net operating income of $138,093 and a theoretical overall return of 5.46%. The PUC rejected the use of an industry average. Utility petitioned for reconsideration of the December Order. Utility argued that the PUC erred in using Utility's actual capital structure. Utility also argued that the limitations PUC placed on the part-time employee expense violated established law and that the PUC may not invade management discretion. The PUC denied Utility's challenges in an Opinion and Order entered April 24, 2007 (April Order).[7] Utility appeals to this Court.

Utility raises two issues: (1) Did the PUC properly use Utility's actual capital structure in calculating Utility's proper rate of return?;[8] and (2) Did the PUC violate the managerial discretion doctrine by placing conditions on its approval of part-time employee expenses?

---

**6.** Part of the dispute as to this expense was that, at the time of the request, the Utility did not have any part-time employees. The Utility had indicated that it did not have any part-time employees because it did not have the funds for them, but that it would hire them if the funds were available. The PUC, allowed the expense claim "on condition that the [Utility] annually employs part-time employees with a total amount of compensation not to exceed the $11,546 claimed on the record." (PUC Opinion at 14.) The PUC also required the Utility to "annually report to our Bureau of Fixed Utility Services (FUS) to verify that it has complied with this condition." (PUC Opinion at 14.)

**7.** There was also an error that the PUC acknowledged making, specifically that it mistakenly eliminated all federal income tax liability. This error was corrected by the April Order the PUC issued as to the reconsideration petition.

**8.** Utility identified this issue as two issues:

(1) Did the PUC commit an error of law by failing to employ a typical, industry average capital structure in determining [Utility]'s overall rate of return, and confiscating shareholders [sic] return of investment [depreciation expense] in violation of decisions of the United State [sic] Supreme Court and the Pennsylvania courts that require the PUC to allow revenues sufficient to cover debt service, a profit for investors and a return of investment through revenues to cover depreciation expense?

. . . .

(2) Did the PUC abuse its discretion under ratemaking standards by failing to balance the interests of ratepayers and the utility?
(Utility's Br. at 5.)

■ We first note that, in reviewing the PUC's December Order, we must employ the following standard of review:

[This Court's] duty is to determine only whether or not the PUC's findings are supported by substantial evidence; we may not substitute our judgment for that of the PUC, nor may we "indulge in the processes of weighing evidence and resolving conflicting testimony."

The decision at issue, involving complex financial determinations and weighing and interpreting statistical and economic evidence, is within the PUC's area of expertise.

. . . .

As long as there is a rational basis for the PUC's methodology [in establishing a rate structure], such decisions are left entirely up to the discretion of the PUC which, using its expertise, is the only one which can properly determine which method is the most accurate given the particular circumstances of the case and economic climate.

It is well settled that the establishment of a rate structure ... is an administrative function peculiarly within the expertise of the PUC.

*City of Lancaster (Water) v. Pennsylvania Public Utility Commission*, 769 A.2d 567, 571–72 (Pa.Cmwlth.2001) (quoting *Popow-sky v. Pennsylvania Public Utility*, 550 Pa. 449, 457–58, 706 A.2d 1197, 1201 (1997) (alterations in original)).

Utility first argues that the PUC should have allowed Utility to use a hypothetical capital structure. In support of this position Utility relies on expert testimony,[9] which Utility contends shows that the net income available for return of $138,093 which arises from the December Order is insufficient to cover Utility's yearly debt service, let alone enable Utility to realize a profit.[10] Accordingly, Utility argues that the rates are confiscatory under the United States Constitution. Utility also argues that the PUC erred by including depreciation as income in its rate-making calculations. Alternatively, Utility argues that the PUC has held that where a utility is too heavily weighted on either the debt or equity side, the PUC must make adjustments to the utility's capital structure. Utility argues that the minimal rate of return results in a balance that weighs too much against Utility.

■ In reviewing these arguments we first note that a utility has a constitutional and statutory right to a reasonable rate of return. *Bluefield Waterworks Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 690–93, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).[11] Pursu-

---

9. Pauline M. Ahern, CRRA, Vice President AUS Consultants—Utility Services (*See* Ahern Dep.).

10. Utility argues that "in straining to provide for debt service coverage (which [the PUC] ultimately failed to do), it illegally confiscated [Utility's] return of investment (i.e. income to cover depreciation expense), which is guaranteed to be returned to investors [and instead] applied it toward debt service." (Utility's Br. at 11 (footnotes omitted).)

11. The United States Supreme Court found that:

Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.

262 U.S. at 690. The High Court further found that:

What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A pub-

ant to Section 1301 of the Code,[12] 66 Pa. C.S. § 1301, the rates charged by a municipal corporation providing service beyond its corporate limits must be just and reasonable. Whether a rate is reasonable is determined by the PUC based upon whether the provider of service receives a fair rate of return. *National Utilities, Inc. v. Pennsylvania Public Utility Commission*, 709 A.2d 972, 975 (Pa.Cmwlth. 1998). The determination of a proper rate of return requires calculation of the utility's capital structure (either actual or hypothetical) and, with respect to the different types of capital, the cost of that type of capital during the period in issue. "The capital structure of a corporation may affect, sometimes drastically, the cost of capital. The capital structure is, in reality, little more than those dollars represented by its common and preferred stock and its debt." *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa.Cmwlth. 135, 317 A.2d 917, 921 (1974). In discussing the "cost of capital," this Court has noted that:

> [Cost of capital] is a percentage figure of the cost a public utility would be obliged to pay to obtain debt and equity capital. The cost of capital study should give consideration to the utility's financial structure, credit standing, dividends, interest, risks, regulatory lag, wasting assets, and any peculiar features of the utility involved. Because of these many variables, the cost of capital is basically a matter of judgment governed by the evidence presented and the regulatory agency's expertise. Although the cost of

lic utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

262 U.S. at 692–93. Subsequent decisions of the high court have further explained this to mean that "it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333

(1944). Our Pennsylvania Supreme Court has similarly noted that:

> a utility's earned return on its rate base is to be measured only after its operating expenses have been deducted from gross revenues; and prescribed rates which are not sufficient to allow recovery of operating expenses, in addition to providing a fair return on the rate base, are confiscatory. However, just as a utility has no constitutional right to have included in its rate base assets which are not "used and useful" in the public service, so too may it be restricted as to what items it can properly claim as operating expenses.

*Barasch v. Pennsylvania Public Utility Commission*, 516 Pa. 142, 164–65, 532 A.2d 325, 336 (1987) (citation omitted).

12. Section 1301 provides:

> Every rate made, demanded, or received by any public utility … shall be just and reasonable, and in conformity with regulations or orders of the commission. Only public utility service being furnished or rendered by a municipal corporation, … beyond its corporate limits, shall be subject to regulation and control by the commission as to rates, with the same force, and in like manner, as if such service were rendered by a public utility.

66 Pa.C.S. § 1301.

capital (represented by a percentage figure) does not control what is a fair rate of return, it is certainly one of the most important bases upon which a fair rate of return is determined.

*Lower Paxton,* 317 A.2d at 921(citations omitted). "Where a utility's actual capital structure is too heavily weighted on either the debt or equity side, the [PUC], which is responsible for determining a capital structure which allocates the cost of debt and equity in their proper proportions, must make adjustments to the utility's capital structure." *Carnegie Natural Gas Company v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 436, 433 A.2d 938, 940 (1981). Utility bears the burden of proving the justness and reasonableness of the requested rate increase. *Popowsky v. Pennsylvania Public Utility Commission,* 674 A.2d 1149, 1153 (Pa.Cmwlth. 1996).

■ While precedent allows the PUC to make adjustments to unbalanced capital structure by using a hypothetical capital structure, it does not require the PUC to do so—the use of a hypothetical capital structure is solely in the discretion of the PUC. *See Lower Paxton,* 317 A.2d at 921. "The capital structure of a public utility is a determination representing a judgment figure which should be left to the regulatory agency and which should not be disturbed except for a manifest abuse of discretion." *Lower Paxton,* 317 A.2d at 922.

■ Utility's arguments as to this issue are essentially founded in substantial evidence—at their essence these arguments ask this Court to credit Utility's evidence over the evidence found more credible by the PUC. Our standard of review is well established:

> Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Hence, appellate review must focus on whether there is rational support in the record, when reviewed as a whole, for the agency action.... [T]he Commonwealth Court ... in order to reverse, must conclude that the findings of the agency are totally without support in the record.

*Republic Steel Corp. v. Workmen's Compensation Appeal Board (Shinsky),* 492 Pa. 1, 5, 421 A.2d 1060, 1062–63 (1980). Since there is evidence to support the PUC's decision, we cannot say that their decision is without support in the record.

Expert testimony presented by Advocate and OTS supported using Utility's actual capital structure. The record indicates that Utility's debt ratios were decreasing as the PennVest loans were being paid down (e.g. debt ratio on September 30, 2005 was 81.79% and was 69.29% on September 30, 2006).[13] The PUC also argues that applying a hypothetical capital structure "would require the Company's customers to pay a return of approximately 10.0 % [sic] on 10.09% of the Company's rate base, when, in fact, that rate base is financed by PennVest debt that costs only 1%." (PUC's Br. at 17 (quoting PUC Opinion at 53) (alteration in original).) While Utility produced contrary expert testimony, it is within the PUC's discretion to evaluate conflicting evidence and make factual findings.

---

13. For instance, Advocate expert Dr. Wooldridge, testified that the low cash flows that Utility has in the early (present) years of the PennVest funded investment, arises from the relatively short-term of these loans used to finance assets that will be depreciated over a much longer time period. Consequently though, Utility will have a cash flow benefit because it collects a return on rate base long after the loan has been repaid since the plant has a longer service life than the loan repayment period. (*See* Testimony of Marilyn J. Kraus at 9, R.R. 435a.)

Applying the standard set forth in *City of Lancaster*, we have reviewed the PUC Opinion and there is a rational basis for the PUC's methodology. The PUC Opinion decision involves complex financial determinations and the weighing and interpreting of evidence, which the PUC did.[14] The PUC Opinion is supported by substantial evidence, does not conflict with the law, and is rationally derived from the application of the law to the facts of the case.[15]

---

14. The testimony supported the PUC's handling of depreciation. Net income is intended to cover the return *on* investment, not the return *of* investment. Return *of* investment (i.e., capital) is recovered through the depreciation expense. Utility's own expert acknowledged this. Utility's expert testified that, "in the ratemaking paradigm depreciation represents the return of capital, i.e., rate base and is not intended to fund debt repayments which are funded by the return, specifically the equity return." (Ahern Dep. at 54.) This Court's precedent similarly treats "[A]nnual depreciation [as] an expense item [that] is intended to permit the public utility to recover 100 percent of its investment in property devoted to its public service, no more and no less." *Pennsylvania Power & Light Company v. Pennsylvania Public Utility Commission*, 10 Pa.Cmwlth. 328, 311 A.2d 151, 155–56 (1973). In this case, the PUC permitted a 10.6% return on the equity portion of Utility's capital structure, and allowed a 3.18% return on its actual debt, which was primarily in the form of 1% PennVest loans.

The Consumer Advocate correctly identified and described the mechanism at issue in this case:

It is the accrued depreciation reserve that is subtracted from the Company's plant in service that forms the rate base to which the Company's rate of return is applied. Thus, where the depreciation expense is lower than principal payments on the loan used to finance a portion of that plant, the rate base is higher. Over the life of the assets this will produce a cash shortfall in the early years and a cash surplus in the later years when the Company is still collecting depreciation expense and a return on the undepreciated rate base, even after the underlying loan has been fully paid off. What the [Utility] has requested is a windfall in the early years, (in the guise of hypothetical equity and the return on that equity), in addition to cash surplus in the later years.

(Consumer Advocate, Intervenor's Br. at 20 (footnote omitted).) It is troubling to this Court and, at first blush seems to run afoul of precedent prohibiting confiscatory rates, that Utility is receiving rates that result in a cash shortfall. Our concern is alleviated because Utility, itself, made the choice to pursue this means of compensation. The PUC has issued a Statement of Policy that provides that utilities with PennVest debt may choose one of two means of recovering principal and interest payments from consumer: (1) surcharge; or alternatively (2) rate base/rate of return. *See* 52 Pa.Code § 69.363; *see also* 66 Pa.C.S. § 1307. Had the Utility chosen the former, it would have been fully compensated, upfront, for the PennVest debt. Utility chose the latter and, with that choice, chose to receive the balance of funds later in the life of the plant. As such, its shortfall can be said to be the result of its own business decision, and not because of confiscatory rates.

This Court has noted that "we believe that if the General Assembly had intended that the Commission grant rate increases to ensure payment of [PennVest loans] *without* regard to existing rate making principles, it need merely have so stated" which, by the language of the Act, it did not. *Barasch v. Pennsylvania Public Utility Commission*, 127 Pa. Cmwlth. 544, 562 A.2d 414, 418 (1989) (discussing provision of the partially repealed Water Facilities Restoration Act, 32 Pa.C.S. §§ 7501–7518, that has been incorporated without change into the PennVest Act) (emphasis in original).

In the present case, the PUC applied ratemaking principles, concluding that, on balance, it would be unfair to charge ratepayers as if 1.2 million of the investment that was funded by 1% PennVest loans were "hypothetically" considered to have been financed by 10.6% equity. Given the choice Utility had in how it would be compensated, we find no legal error or abuse of discretion in that decision, and conclude that there is a rational basis for the PUC's methodology.

15. We note that there was some dissent among the PUC commissioners as to whether a hypothetical structure should be used. (*See PUC v. Emporium Water Company*, DEC–

Accordingly, as to this first issue, we find no error in the PUC's determination that Utility should not be allowed to use a hypothetical capital structure and that Utility should be allowed a revenue increase of 37.68%, amounting to $238,639.

 Utility next argues that the PUC violated the managerial discretion doctrine by placing conditions on its approval of part-time employee expenses, in particular because there was no finding that Utility had abused its discretion. Utility argues that the December Order interfered with Utility's ability to determine its future, part-time staffing needs and made an ad hoc decision that Utility's employment needs would remain at the same level.

 In addressing this argument we note that:

[a]s a general matter, utility management is in the hands of the utility and the [PUC] may not interfere with lawful management decisions, including decisions related to the necessity and propriety of operating expenses, unless, on the basis of record evidence, it finds an abuse of the utility's managerial discretion.

*National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission*, 76 Pa.Cmwlth. 102, 464 A.2d 546, 559 (1983). However, a utility bears the burden of proving the reasonableness of each element of its claim. *Popowsky v. Pennsylvania Public Utility Commission*, 869 A.2d 1144, 1152 (Pa.Cmwlth.2005). This burden is not a shifting one, but remains with the utility. All claims must be based on known, measureable, reasonable expenses. *Id.* The PUC has wide discretion in the type of adjustments and conditions it may issue. *Philadelphia Elec. Co. v. Pennsylvania Public Utility Commission*, 93 Pa.Cmwlth. 410, 502 A.2d 722, 731 (1985).

In the present case, the PUC acted within its discretion by approving the expenses that Utility had requested. The PUC's placement of this condition is not a violation of the utility management discretion doctrine. In this case, Utility received what it had requested. Utility made this request after it's management concluded what the needs were. The PUC

2006–OSA–0362 (Dissenting Statement of Commissioner Terrance J. Fitzpatrick), December 21, 2006). Similarly, in response to the PUC's denial of Utility's Petition for Reconsideration, Commissioner Kim Pizzingrilli expressed reservations as to the PUC's determination, essentially underscoring Commissioner Fitzpatrick's Dissenting Statement (*See PUC v. Emporium Water Company*, April 2007–OSA–0065 (Statement of Commissioner Kim Pizzingrilli), April 24, 2007). In both these statements, Commissioners Fitzpatrick and Pizzingrilli presented cogent reasons about why the hypothetical capital structure would be appropriate in this case. For instance, Commissioner Pizzingrilli noted that, "Use of [Emporium's] actual capital structure, at this time, will not produce revenues sufficient to cover both its debt service and its allowance for depreciation. This occurs because the amortization period for PENNVEST loans is shorter than the amortization period used for depreciation." (Statement of Commissioner Pizzingrilli at 1.) We note that neither of the dissenting Commissioners dispute that PUC can treat depreciation in the manner it did (*See, e.g.,* Statement of Commissioner Pizzingrilli at 1 (stating that "While I recognize that the cash available from depreciation can be used for debt service and produce adequate debt coverage ratios, this may not strike the fair balance of consumer and investor interest that is required under the law.").)

It is not this Court's role to choose between the conflicting approaches set forth by the various Commissioners. Our appellate role is limited and one of deference to the PUC. As we find nothing that legally *requires* the use of a hypothetical capital structure, and we find no abuse of discretion by the PUC in its December Order, we are bound to affirm the PUC's determination.

found sufficient basis to grant this claim and we find no error in the PUC's determination. However, the PUC appropriately noted that, in previous years, Utility has sought income expense revenue, only to use the approved funds for some other purpose. Utility acknowledged that a previous salary payment authorized by the PUC to Utility's president was never actually paid to the president. By requiring Utility to file an annual report verifying that it actually made the salary payments it had requested, the PUC is simply asking for verification and holding Utility accountable. We find no error with the PUC's determination.

For these reasons, we affirm the PUC's Orders entered December 28, 2006 and April 24, 2007.

### ORDER

**NOW,** June 4, 2008, the orders entered December 28, 2006 and April 24, 2007 by the Pennsylvania Public Utility Commission in the above-captioned matter are hereby **affirmed.**