# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Greenview Properties 862, LLC, :
                      Appellant :
 :
                     : No. 799 C.D. 2020
           v. :
 :
                     : Argued: April 12, 2021
Hamilton Township Zoning Hearing :
Board and Hamilton Township :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE PATRICIA A. McCULLOUGH, (P.) Judge
               HONORABLE ANNE E. COVEY, Judge

## _OPINION NOT REPORTED_

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                    FILED: May 26, 2021


       Greenview Properties 862, LLC (Landowner) appeals from the July 13, 2020 order of the Court of Common Pleas of Monroe County (trial court), which concluded that Landowner violated the Hamilton Township Zoning Ordinance (Ordinance), by conducting a "Clean Fill Facility" on a 59-acre tract of land it owns in Hamilton Township (Township). This appeal involves the interpretation of Section 402.1(c) of the Ordinance, and relatedly, whether the Ordinance prohibits Landowner's clean fill operation on property (Property) located in the Zoning District "A."[1]

---

[1] Pursuant to Schedule 1 of the Ordinance, the only permitted uses in Zoning District "A" are: Single Family Residential (Use Class 1); Conservation (Use Class 6); Agriculture (Use Class 7); Accessory Uses & Essential Services (Use Class 8); Conversions (Use Class 9); Related Residential Uses (Use Class 11); Appropriate Public Uses (Use Class 12); Planned Residential (Use Class 14); and Correctional Institutions (Use Class 15). (Hamilton Township Zoning Ordinance, Schedule 1. (Ordinance No. 2008-02-11, Reproduced Record (R.R.) at 163a-64a.)

## Section 402.1(c) of the Ordinance

In 2008, the Board of Supervisors of Hamilton Township amended Section 402.1 of the Hamilton Township Zoning Ordinance by modifying the Use Class 5–Industrial Zoning District. (Ordinance No. 2008-02-11, R.R. at 163a-64a.) The 2008 amendment added subsection (c) to Section 402.1. Since the 2008 amendment, the following activities are only permitted in the Use Class 5–Industrial Zoning District pursuant to Section 402.1(c) of the Ordinance:

> ***The collection, processing, re-processing, and/or storage*** of stone: rocks; *soil*; sand; wood; post-construction concrete, masonry or asphalt; or similar materials. Such use shall be: (1) conducted outside a completely enclosed building; (2) located on the property such that there is a minimum setback of 300 feet between the collection, processing, reprocessing, and/or storage activities comprising that use and the lot line of any dwelling; church, school or similar institution; cemetery; public park; and public road right-of-way; and (3) operated only between the hours of 7 a.m. and 6 p.m. The applicant shall provide the Township with copies of all required state and/or federal licenses and permits for review with the security and maintenance of such license and/or permits being a mandatory condition of such use.

(Hamilton Township Ordinance No. 2008-02-11, R.R. at 143a (emphasis added).

## Landowner's Purchase of the Property and Activities Thereon

The Property is owned by Landowner and is approximately 59 acres located in Zoning District "A." The Property was acquired by Landowner in August of 2015. The members of Landowner, a limited liability company, are Michael Miller and David Norris.

Contaminated soil had been deposited on the Property before Landowner bought it. There was also a shale pit on the Property. In 2017, Landowner obtained a

National Pollution Discharge Elimination System (NPDES) permit[2] from the Pennsylvania Department of Environmental Protection (DEP) to raise the grade on approximately six acres of the Property - from the rear shale pit towards Greenview Drive. The NPDES permit required that the area of contaminated be soil capped with a minimum of three feet of clean soil before the deposit of any other soil.

On June 3, 2017, Landowner entered into a "Clean Fill Facility Operation and Maintenance Agreement" with three other parties: Earth Efficient Greenview, LLC, Earth Efficient, LLC, and Greenview Management, LLC (also owned by Norris and Miller). The Agreement called for the parties to operate a "Clean Fill Facility" on the Property. (R.R. at 2037a.) Greenview Management, LLC was listed as the "Manager" of the Facility, which was "authorized to sublicense the use and operation of the Facility." *Id.* Earth Efficient Greenview, LLC, was identified as the "Operator," which would take over the "operation, management and maintenance of the Clean Fill Facility, including the construction of associated erosion and sedimentation control" so that the business could "engage in the importing and exporting of clean fill pursuant to Environmental Law and applicable local law, and the import and export of other materials pursuant to applicable local laws as contemplated in this Agreement." *Id.* The "Whereas" clauses on page 2 of the Agreement indicate that the Facility was, at that time, permitted to accept approximately 300,000 tons of clean fill for the remaining life of the Facility and that the parties were exploring the option to expand the initial NPDES permit to increase the permitted airspace of the Facility, and that Greenview Management was to obtain additional permits to increase the airspace to accommodate

---

[2] Permits for earth disturbance, including the importation of fill and which involve more than one acre, must be secured through the Department of Environmental Protection (DEP). 25 Pa. Code §102.5. Issuance of these permits are independent of, and not governed by, local municipal zoning ordinances such as, in this case, Hamilton Township, but the activity is nonetheless subject to municipal zoning ordinances, which regulate the *uses* permitted to be conducted on property.

3

an estimated 2.7 million tons of clean fill over the remaining life of the Facility. *Id.* Sections 2.5(x) and 2.6(i)(n) of the Clean Fill Agreement characterized the process occurring at the Property as "accepting" and "storing" clean fill for resale. (R.R. at 2043a, 2045a.) The Agreement also provided that Landowner was to be compensated for every truckload of fill brought onto the Property. (R.R. at 2047a.)

In January of 2018, Landowner obtained a modification of its 2017 NPDES permit to disturb an additional 14 acres (for a total of 20 acres) to further extend the flat and level grade towards Greenview Drive. The modified NPDES permit authorized Landowner to deposit hundreds of thousands of tons of more fill onto the Property. The modified NPDES permit required that the final graded fill area be planted with trees to stabilize it.

Between February 21, 2018, and June 4, 2018, 25,200 tons of soil from New York City and New Jersey were delivered to the Property by 395 dump truck deliveries. (R.R. at 1947a-2026a.)

### Hamilton Township Zoning Officer's Enforcement Notice

On March 22, 2018, after neighbors complained about the large number of trucks going in and out of the Property,[3] the Township Zoning Officer issued an Enforcement Notice to Landowner, which described two alleged zoning violations and the potential consequences of Landowner's continued violation. Specifically, the Enforcement Notice charged Landowner with violating Section 402.1(c) of the Ordinance for collecting, processing, re-processing, and/or storing soil in a zone other than the zone where such use is permitted, namely the Use Class 5 - Industrial Zone.

---

[3] According to neighbors, the Property is in a quiet residential area. As the result of Landowner's operations, there has been daily truck traffic which created dust and noise, starting at 8 a.m. in the morning to 7 p.m. at night from Monday to Friday and sometimes on Saturday at 2:30 a.m. (Notes of Testimony (N.T.) at 143, 147; R.R. at 2337a, 2341a.)

4

The Enforcement Notice also charged Landowner with violating Section 902.1 of the Ordinance for failing to obtain a permit before placing a truck scale and a 14' x 40' scale house on the Property. The Enforcement Notice stated:

> The use which [Landowner] and Earth Efficient Greenview, LLC are currently undertaking at the subject property is an industrial use, specifically the activity outlined in Section 402.1 (c) . . . .The activity which is being conducted is the collection, processing, reprocessing, and/or storage of soil or similar materials on a large scale, whereby construction vehicles and hauling vehicles are being utilized to import soil from out-of-state and in-state locations to the premises for commercial gain. In part, the property at issue is being used as a dumping or landfill site for soil brought from a state or states other than Pennsylvania as a consequence of such state or states prohibiting the landfilling or dumping or processing or reprocessing and/or storage of such soil within their borders.
>
> Additionally, Article IX, Section 902.1 of the Zoning Ordinance prohibits the erection, alteration, conversion of any structure, building, or part thereof, until a zoning permit has been issued by the Zoning Officer. [Landowner] and/or Earth Efficient Greenview, LLC have erected a scale and scale house structure on the site without first obtaining a Zoning permit.

(Enforcement Notice at 1-2, R.R. at 164a-65a.)

The Enforcement Notice ordered Landowner to cease and desist use of the Zone "A" Property for industrial purposes and to remove the truck scale and scale house within two weeks of service of the Notice. *Id.* at 2, R.R. at 165a.

**Proceedings Before the Board**

Landowner appealed the Enforcement Notice to the Zoning Hearing Board (Board), which granted party status to four neighboring property owners, based upon the close proximity of each of their residences to the Property and the adverse

5

effects each of these parties stated they have experienced arising out of or from Landowner's ongoing fill operations on the Property. (Board Decision, at 8.) The Board conducted over 28 evidentiary hearings during which it received more than 150 exhibits.[4]

Landowner argued to the Board that Section 401.2(c) of the Ordinance was not applicable because its fill operation did not involve the "collection, processing, reprocessing, and/or storage of" soil. Norris and Miller testified on behalf of Landowner. Norris denied Landowner was conducting a clean fill enterprise for commercial gain and attempted to convince the Board that its fill activity was used solely for the purpose of leveling the grade for a tree farm and possibly a residential development in the future. (N.T. at 1175-76; R.R. at 645a-46a.) Miller testified that Landowner had purchased 1,200 saplings, and 800 trees were planted. (N.T. at 2164, 2219; R.R. at 1325a, 1404a.) Landowner also presented photographs of planted trees. On cross-examination, Miller conceded that, as part of its NPDES permit, Landowner was required to record a Declaration and Restriction of Covenants applicable to the Property, including provisions pertaining to trees that need to be planted, and the final grade. (N.T. at 2109; R.R. at 1270a.)

Landowner offered no testimony demonstrating a reason or need to import vast quantities of fill to accommodate a tree farm and admitted that it has no present development plans for the Property. Miller testified that Landowner was entitled to expand its operations even further to cover more acreage, so long as it went through the permitting process. (N.T. at 2300; R.R. at 1485a.)

Alternatively, Landowner argued that the terms "collection," "processing," "reprocessing" and "storage" as used in Section 402.1(c) of the

---

[4] The transcript is over 2,500 pages and the Reproduced Record filed in this Court is 12 volumes.

6

Ordinance were ambiguous because they have multiple definitions and, thus, must be interpreted either: (1) by reference to the use of similar terms in other Township ordinances and other statutes governing solid waste and clean fill, including the Solid Waste Management Act;[5] or (2) by applying the least restrictive interpretation of the terms as required by section 603.1 of the Pennsylvania Municipalities Planning Code (MPC).[6]

The Township countered by introducing the Clean Fill Facility Agreement and evidence of the ongoing importation, collection, and storage of fill and the landfilling of the Property. The Township demonstrated that in some locations, over 40 feet of fill was deposited. (R.R. at 2450a.) The Township also offered exhibits and testimony of the scale of the soil operation under the NPDES initial permit and under the modified NPDES permit. An engineer from the Monroe County Conservation District testified that, based on his calculations, the first permit allowed for 65,000 cubic yards of soil. (N.T. at 62; R.R. at 2243a), and that under the modified permit there would be an additional 485,000 cubic yards of soil deposited on the Property. (N.T. at 68; R.R. at 2249a.) The Township presented evidence of the number of truckloads that would be needed to bring in the amount of soil authorized by the modified NPDES permit. Nate Oiler, the Township's engineer, calculated that the average number of cubic yards per each triaxle truck was 18, thus 26,111 truckloads

---

[5] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101-6018.1003.

[6] Act of July 31, 1968, P.L. 805, *as amended*, added by Act of December 21, 1988, P.L. 1329, 53 P.S. §10603.1. Section 603.1 states:

> In interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction.

would be authorized by the modified NPDES permit. As per Oiler's calculations, this averaged to 12.28 trips per day, which over 365 days would result in 4,380 truckloads. Oiler testified that at that rate of delivery, it would take Landowner another six years to complete the authorized fill. *See* Board Summary of Facts at 15-16.

The Township also introduced testimony from Oiler about the need for grading on the Property. Oiler testified that there was no reason that a landowner would need to import that much soil to grade a lot for a tree farm. (N.T. 385-86; R.R. at 485a-86a.) He further testified that there was no pending land development plan before the Township. (N.T. at 388; R.R. at 488a.)

## Board Findings of Fact and Decision

The Board denied Landowner's appeal from the Enforcement Notice. The Board rejected Landowner's claim that it was merely depositing soil in order to change the grade of the Property for purposes of a tree farm or for future development. Instead, the Board found that Landowner was "operating a landfill business for commercial gain" and that this was not permitted in Zoning District "A." It found in Finding of Fact (F.F.) 60:

> The Board concludes based upon the record that [Landowner] is operating a landfill business for commercial gain since [Landowner] is being compensated for each and every truckload of fill brought to, deposited on, and thereafter processed and stored on the Property. The commercial enterprise is the delivery and importation of fill to the Property for compensation.

(Board Decision, 12/3/19, F.F. No. 60; R.R. at 235a.)

The Board explained its reasoning in Finding of Fact 61:

> The evidence is unequivocal that [Landowner] is not importing fill onto the Property for the immediate purpose of grading the Property for a development to be constructed by

8

> [Landowner]. Rather, [Landowner] has admitted that it has no present development plans for the Property nor has [Landowner] submitted a Land Development Plan proposal to the Township for the development of the Property subsequent to the completion of the fill operation. The fill operation at present appears to be a distinct business operated by [Landowner]. Landowner's plans to "farm" Christmas trees placed on the Property appears to be an interim concept with no final development plan contemplated by [Landowner] at this time. [Landowner] has not produced any evidence that after the fill operation is complete the Property in the fill area will be developable or developed and improved.

(Board Decision, 12/3/19, F.F. No. 61; R.R. at 235a.)

Regarding Landowner's contention that the terms "collection," "processing," "reprocessing," and/or "storage" in Section 402.1(c) of the Ordinance were ambiguous, the Board rejected this claim as well. The Board found these terms were unambiguous and clearly defined using dictionary definitions. The Board found that, despite Landowner's urging, it was, therefore, unnecessary to resort to alternative methods of statutory interpretation. Using the ordinary and regular meaning of the words of Section 402.1(c) of the Ordinance based upon the definitions set forth in *Webster's New College Dictionary*, Third Edition, the *American Heritage Dictionary of English Language*, Fifth Edition, and the *Collins English Dictionary—Complete and Unabridged*, 12th Edition 2014, the Board listed and recited the definitions of "collection," "process," "reprocess," and "storage." Applying these dictionary definitions of the terms, the Board held that it was clear that Landowner's Clean Fill Facility involved the "collection," "processing," and "storage" of fill on the Property. At page 31 of its Decision, the Board found as follows:

> Using the dictionary definition of the term "collection" it is clear that the fill operation on the Property involves: (1)

"collection" as it involves the "deposit" of fill on the Property; (2) a "process" where the deposited fill is first evaluated, tested and graded to comply with the requirement imposed by the [DEP] in the [modified NPDES permit] and thereafter is planted with Christmas tree seedlings as required by the NPDES Permit; and (3) the "storage" of dirt, concrete and the other components of the fill deposited on the Property.

(Board Decision, 12/3/19, at 31; R.R. at 224a.)

The Board went on to conclude:

Accordingly, since "deposit" is included in the dictionary definition of the term "collection" and since the fill undergoes a "process" as defined in the dictionary involving testing, grading, stabilization, and tree planting and the fill is long-term "storage" as defined in the dictionary, the Board's conclusion is that the "collection," "processing," and "storage" prongs of Section 402.1 Use Class 5 are triggered by [Landowner's] fill operation. Since collection, processing and storage of stone, rocks, soil, post-construction concrete, masonry and asphalt are expressly designated in Section 402.1 Use Class 5, that Use is permitted only in the Industrial District and the Property is entirely within Zoning District A, the Board must deny [Landowner's] appeal and find that [Landowner] is in violation of Section 402.1 Use Class 5 of the Ordinance as alleged in the Enforcement Notice.

(Board Decision, 12/3/19, at 31-32; R.R. at 196a.)

The Board concluded that Landowner's Clean Fill Facility was allowed in the Industrial Zone, but was not one of the uses permitted in Zoning District "A," and the fact that Landowner was being compensated for each truckload of fill brought onto

10

the Property "unequivocally demonstrated" that Landowner was "operating a landfill business on the Property" for commercial gain.[7]  *Id.* at 32-33; R.R. at 197a-98a.

## Landowner's Motion to Take Additional Testimony

Landowner appealed to the trial court and filed a Motion to Take Additional Testimony.  The trial court held a hearing on the motion.  Landowner argued that, contrary to the Board's finding that the Ordinance unambiguously applied to its activities, the Ordinance unambiguously did not apply to its activities on the Property because the "permanent placement of fill" is different from the "collection" of it.  (R.R. at 261a.)   In support of its interpretation, Landowner sought to present additional evidence that the Township enacted Section 402.1(c) of the Ordinance because it was concerned about "material processing" that was occurring outside of the Industrial Zoning District.  (R.R. at 264a.)  Landowner argued that other property owners are depositing permanent fill and not being cited for it.  As an example, Landowner's counsel referenced the Ray Price Honda site where the landowner was allowed to bring "an enormous amount of fill" on the property without a zoning permit.  (R.R. at 268a.)

In the course of that hearing, the trial court hypothetically posited the question as to whether Section 402.1(c) of the Ordinance prevented a homeowner from using a "bag of mulch" in his garden because it would be considered as "collecting a deposit of soil," especially if the homeowner's property was outside the Industrial Zone.  Landowner's counsel responded, "that's the way [the Board is] interpreting it, so broadly that, [the Ordinance] could apply to [filling in my garden], which renders it ambiguous and therefore the rules [of statutory construction] kick in."  (R.R. at 285a.)

---

[7] The Board also concluded that Landowner violated Article IX, Section 902.1 of the Ordinance by placing a truck scale and scale house structure on the site without first obtaining a Zoning Permit.  That issue is not before us.

11

By order and decision dated March 4, 2020, the trial court denied Landowner's Motion to Take Additional Testimony.

## Trial Court Decision

The trial court affirmed the Board. Observing that the Board's interpretation of its own Ordinance is to be given great weight, the trial court rejected Landowner's argument that the Ordinance was ambiguous. The trial court found that the Board's conclusion the Ordinance was not ambiguous was supported by the plain language of the Ordinance. (Trial ct. op. at 10.)

The trial court next addressed Landowner's argument that Section 402.1(c) of the Ordinance did not apply to its activities. Landowner asserted that it would be absurd to apply Section 402.1(c) of the Ordinance to the permanent placement of fill when the grading of the Property was in connection with an allowed zoning use. The trial court addressed the bag of mulch scenario. It explained that whether the Ordinance applies to the "collection," "processing," "reprocessing," and/or "storage" of soil must be determined by examining the principal use of the land, not an accessory use. *Id.* at 11. The trial court noted that because the Board found that Landowner's primary activity was the commercial operation of the Clean Fill Facility, Landowner was required to demonstrate that this finding was not supported by substantial evidence.

The trial court found that there was ample evidence to support the Board's findings. The trial court determined, based on extensive testimony and the multitude of exhibits generated during the Board's hearings, that it was "obvious" that Landowner was "selling a parking place for soil and the principal use of the [P]roperty [was] a landfill" and that the "Clean Fill Agreement's obvious purpose was to store fill on the Property for compensation." *Id.* at 13-14. The trial court concluded that the

12

Township's evidence proved that Landowner's actual objective was not a tree farm. It further concluded that the evidence of record reflected the Board's conclusion that Landowner was required to plant trees on the giant mound at the completion of its operations, to comply with its NPDES permit, with the real objective being to conduct a profitable landfill. *Id.* at 14.

## Analysis

On appeal,[8] Landowner raises three issues, which we have condensed into two: (1) whether the trial court erred or abused its discretion by concluding that the Board's finding that Landowner's principal use of the Property was a Clean Fill Facility was supported by substantial evidence; and (2) whether the trial court erred or abused its discretion by affirming the Board's conclusion that Section 402.1(c) of the Ordinance unambiguously applies to the permanent placement of fill for a grade change.

## Substantial Evidence

Landowner argues that the Board's finding that Landowner's principal use of the Property is a Clean Fill Facility/landfill was not supported by substantial evidence. It contends the record instead supported the conclusion that the importation and deposit of fill was a temporary activity for the construction of the principal end use of a tree farm on the Property. Landowner argues that the evidence demonstrated that it raised a portion of the Property to final grade and planted trees over the ex-shale pit

---

[8] The Commonwealth Court's scope of review in zoning cases where, as here, the trial court did not take any additional evidence, is limited to determining whether the Board committed an error of law or a manifest abuse of discretion. *De Cray v. Zoning Hearing Board of Upper Saucon Township*, 599 A.2d 286 (Pa. Cmwlth. 1991). The Board abuses its discretion if its findings are not supported by substantial evidence, *i.e.*, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Valley View Civic Association v. Zoning Board of Adjustment*, 462 A.2d 637 (Pa. 1983).

13

area and its principals testified repeatedly they intend to use the Property as a tree farm. Landowner stresses that both principals, Miller and Norris, testified under oath that they purchased the Property and intended to start a tree farm, and presented evidence that some trees had been planted. Landowner also asserts that it presented evidence that trees are required to be planted in accordance with the deed restriction. Landowner claims the Board ignored this evidence.

The Board, as the factfinder, is the sole judge of credibility with the power to resolve conflicts in the testimony and to reject even uncontradicted testimony if it should find said testimony lacking in credibility. *The Piper Group, Inc. v. Bedminster Township Board of Supervisors*, 992 A.2d 224, 240 (Pa. Cmwlth. 2010).

Here, ample evidence credited by the Board established that Landowner was engaged in a large scale commercial clean fill operation on the Property. The Township proved Landowner imported close to half a million cubic yards of fill and was compensated for each truckload, and that Landowner had secured the necessary NPDES permits to continue the operation for another five to six years. The Clean Fill Facility Agreement also leaves little doubt that Landowner was conducting a "Clean Fill Facility" on the Property as the principal use.[9] The Agreement designated a manager and operator of the Facility. The Agreement stated that the Clean Fill Facility would be used for "storing" clean fill in exchange for compensation. The Agreement provided that Landowner would use its best efforts to obtain the permits necessary to increase the capacity of the Facility to 2.7 million tons by expanding the area of the

---

[9] In light of this conclusion, we also reject Landowner's argument that the Board erroneously considered other factors not expressly contained in Section 401.2(c), such as lack of a development plan, the fact that Landowner received compensation for each truckload dumped, the volume of material dumped, the origin of the clean fill, truck traffic, and the existence or non-existence of a highway occupancy permit. These additional observations merely supplemented the copious evidence that Landowner was operating a Clean Fill Facility on the Property.

Property to be disturbed. (R.R. at 2042a.) The Agreement included a customer non-solicitation clause. *Id.* While the Agreement stated "the anticipated eventual use" of the Facility was as a tree farm, (R.R. at 2037a), this does not detract from the then-current principal use of the Property as a Clean Fill Facility. And, although Landowner's witnesses testified that they intended to establish a tree farm, they never offered any explanation as to why it was necessary to raise the grade of the Property nearly 50 feet in order to accomplish that.

Simply put, the Board did not find Landowner's witnesses credible as to their true intentions for the Property. The trial court affirmed the Board's conclusion, finding it was supported by substantial evidence. We discern no error on the part of the trial court.

### Ambiguity

Next, Landowner argues that the trial court erred by affirming the Board's conclusion that Section 402.1(c) of the Ordinance unambiguously applies to the "permanent placement of fill" to "change the grade" of a property. (Landowner's Br. at 7.) It contends that, contrary to the Board's conclusion, Section 402.1(c) was never intended to preclude mere "grade changes" outside the Industrial Zone. It argues that, when the legislative history is analyzed, the Ordinance was clearly intended to address material stock-pile processing and not the permanent placement of fill to change the grade. Specifically, Landowner faults the trial court for refusing to consider evidence concerning the factual circumstances in which Section 401.2(c) of the Ordinance was enacted to decipher its meaning.

We find no merit in Landowner's position. To begin, the factual premise underlying Landowner's argument is false. The Board did not find Section 402.1(c) unambiguously precludes the deposit of clean fill for the purpose of "changing the

15

grade" of the Property. By distorting the Board's finding and insisting that it was only depositing fill to change the grade of the Property, Landowner is essentially addressing an issue which is not before us. The Board rejected Landowner's explanation of why it was depositing thousands of tons of fill on the Property. It did not believe Landowner was merely depositing fill to change the grade of the Property for a tree farm. Therefore, whether the Ordinance applies to the deposit of fill for mere "grade changes" is not relevant. Instead, the proper inquiry is whether the Board erred in finding that the Ordinance precluded the operation of a commercial Clean Fill Facility outside the Industrial Zoning District.

The rules of statutory construction are summarized in *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968-69 (Pa. Cmwlth. 2015), as follows:

> The primary objective of statutory interpretation is to determine the intent of the enacting legislation. Section 1921 of the Statutory Construction Act of 1972 (Act), 1 Pa.C.S. §1921. In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent and, thus, statutory construction begins with examination of the text itself. *Malt Beverages Distributors Association v. [Pennsylvania] Liquor Control Board*, 918 A.2d 171 (Pa. Cmwlth. 2007) (*en banc*), *aff'd*, 974 A.2d 1144 ([Pa.] 2009).
>
> In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." Section 1903(a) of the Act, 1 Pa.C.S. §1903(a). With respect to zoning matters, "[u]ndefined terms are given their plain meaning, and any doubt is resolved in favor of the landowner and the least restrictive use of the land." *Caln Nether Co., L.P. v. Board of Supervisors of Thornbury Township*, 840 A.2d 484, 491 (Pa. Cmwlth. 2004).

16

Further, where the words of the ordinance are ambiguous, courts construe the ordinance in favor of the landowner. *Lench v. Zoning Board of Adjustment of City of Pittsburgh*, 13 A.3d 576, 579 (Pa. Cmwlth. 2011). A zoning ordinance is ambiguous if the pertinent provision is susceptible to more than one reasonable interpretation, *Adams Outdoor Advertising, L.P. v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006), or when the language is vague, uncertain, or indefinite. *Barasch v. Pennsylvania Public Utility Commission*, 532 A.2d 325, 332 ([Pa.] 1987). Finally, it is well settled that "a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference. Such deference is appropriate because a zoning hearing board, as the entity charged with administering a zoning ordinance, possesses knowledge and expertise in interpreting that ordinance." *Risker v. Smith Township Zoning Hearing Board*, 886 A.2d 727, 731 (Pa. Cmwlth. 2005). Similarly, "because [a township's zoning officer] is charged with the administration and execution of the [ordinance], his interpretation of the ordinance is entitled to deference and should not be disregarded unless shown to be clearly erroneous." *McIntyre v. Board of Supervisors of Shohola Township*, 614 A.2d 335, 337 ([Pa. Cmwlth.] 1992).

Here, the Board strictly followed the rules of statutory construction and interpretation. The Board found the Ordinance did not define the words used in Section 402.1(c), namely, "collection," "processing," "reprocessing," and "storage." The Board used the ordinary and regular meaning of those words based upon their common and approved everyday usages. The Board did not find the terms ambiguous. The trial court properly affirmed the Board's decision after performing the same statutory construction analysis. Application of different methods of statutory construction, such as ascertaining legislative intent, were unnecessary given the trial court's conclusion that Section 402.1(c) was unambiguous. *See Kohl*.

17

Alternatively, from what this Court can discern, Landowner argues that the trial court erred by not finding the Ordinance ambiguous after the court recognized that the permanent placement of a bag of mulch in a garden, for example, would not violate the Ordinance because the placement of mulch would be in connection with an approved use. This so-called judicially created exemption, according to Landowner, should have been applied in an analogous manner to analyze Landowner's permanent placement of fill deposited in connection with a tree farm, an approved use in Zoning District A. Landowner suggests that there is an unwritten "exemption" in Section 402.1(c) which demonstrates there is an ambiguity.[10] We must reject Landowner's attempt to establish an ambiguity by reference to a statement made by the trial court during a hearing on a motion to present additional testimony.

First, Landowner completely ignores the fact that the Board found that Landowner was not merely "raising the grade" of the Property as part of a temporary construction phase of a future land development or tree farm. The Board found that Landowner was unequivocally operating a commercial Clean Fill Facility on the Property. Critically, Landowner does not dispute that Section 401.2(c) of the Ordinance prohibits the operation of a commercial Clean Fill Facility outside the Industrial Zone. This effectively ends the inquiry because whether the terms "collection" and "storage" can be interpreted to include depositing of a bag of mulch in a residential garden seems to this Court to be beside the point. The salient point rather is that the Board found that Section 401.2(c) of the Ordinance prohibits the operation of a Clean Fill Facility outside the Industrial Zone and that Landowner was

---

[10] This is Landowner's only argument made in support of its contention that the Ordinance is ambiguous. Its prior arguments before the Board and trial court that the terms "collection" and "storage" have multiple definitions, or are terms of art, are not argued in this appeal.

doing just that. As we have just explained, that finding was supported by ample substantial evidence.

Moreover, we do not agree that the trial court acknowledged any "exemption" to Section 402.1(c) of the Ordinance. There was no independent finding by the trial court of an "exemption" for properties outside of the Industrial Zone for placement of fill as a principal use. The trial court simply cited the "bag of mulch" example and recognized that a residential property owner can incorporate a bag of mulch in his garden without having the same be a principal use of a landfill or Clean Fill Facility, as the same is merely an accessory activity to the permitted residential use. The incidental placement of soil, for example, by a farmer, including a tree farmer, is one circumstance where it could be argued that the activity should not be characterized as the collection or storage of soil. However, that illustration cannot be extended to the situation presented here where the principal use of the Property was without a doubt a Clean Fill Facility, the sole purpose of which was to store clean fill.

## Conclusion

Upon review of the evidence of record and the relevant statutory and case law, we discern no error of law or abuse of discretion, and thus, the order of the trial court is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Greenview Properties 862, LLC, :
                Appellant :
                 : No. 799 C.D. 2020
        v. :
                 :
Hamilton Township Zoning Hearing :
Board and Hamilton Township :

## *ORDER*

AND NOW, this 26th day of May, 2021, the July 13, 2020 order of the Court of Common Pleas of Monroe County is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge